UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STEVEN MILNER and HEIDI CANNON,          :
                                          :
        Plaintiffs,                       :
V.                                        :        CIVIL NO. 3:02CV01929(SRU)
                                          :
LESTER DUNCKLEE, ET AL.                   :
                                          :
        Defendants.                       :        FEBRUARY 6, 2006

**DEFENDANT LESTER DUNCKLEE'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rules of Civil Procedure 56(b), Defendant State Marshal Lester

Duncklee ("Duncklee") submits this Memorandum of Law in Support of his Motion for

Summary Judgment. Because Duncklee's service of a capias issued by the Connecticut Superior

Court for Plaintiff Steven Milner ("Plaintiff" or "Milner")[1] did not violate clearly established law

or the protections afforded by the Fourth Amendment to the U.S. Constitution, summary

judgment is appropriate on all counts of Plaintiff's Amended Complaint. Although Plaintiff has

attempted to impose artificial boundaries between a capias and an arrest warrant, such

boundaries do not find support in the common law or the Connecticut General Statutes.

Accordingly, Duncklee is entitled to qualified immunity because his actions violated no laws and

was objectively reasonable under the circumstances.

I.      **BACKGROUND**

        A.      **Undisputed Facts**

        Lester Duncklee was and is a Connecticut State Marshal. (Deposition of Lester Duncklee

("Duncklee Depo."), at 4.) Before the state marshal system was created, Duncklee had been a

---

[1]      Plaintiff Heidi Cannon stipulated to the dismissal of her action in September 2005.

deputy sheriff. (Id., at 4-5.) Duncklee is a member of the state marshal capias team. (Id., at 12.)
Duncklee did not receive formal classroom training on civil capiases during his tenure as either a
deputy sheriff or state marshal. (Id., at 11.) Rather, Duncklee received on-the-job training under
the direct supervision of other deputy sheriffs. (Id., at 11-12.) As part of this on-the-job training,
Duncklee observed other deputy sheriffs serve capiases and was instructed on how it was done
and why it was done. (Id.) Based on his prior training, Duncklee believes that a capias is a valid
arrest warrant. (Id., at 16.)

Plaintiff Steven Milner's ("Milner") first marriage ended in 1992. (Deposition of Steven
Milner ("Milner Depo."), at 13.) As part of his divorce, Milner was required to pay a total of
approximately $250.00 per week in child support for his three children. (Id., at 24; see also
Affidavit of Gary B. Traystman, Esq. ("Traystman Aff."), at ¶5.) In or about 1994 or 1995,
Milner unsuccessfully attempted on several occasions to modify this amount. (Milner Depo., at
25.) Milner's final unsuccessful attempt to modify his child support obligation was made before
Connecticut Superior Court Judge Samuel Teller in 1995. (Id., at 108.)

In violation of a court order, Milner stopped paying child support. (Id., at 25; Deposition
of Heidi Cannon ("Cannon Depo."), at 45; Traystman Aff., at ¶6.) Thereafter, a contempt
citation was served on Milner and a hearing was scheduled before Judge Teller, who had been
actively involved in the divorce proceedings. (Traystman Aff., at ¶¶7-8.)

On April 24, 1995, Milner knew that he was required to appear before Judge Teller in
Connecticut Superior Court for failure to pay child support, but he did not appear because "I
knew I couldn't pay the money, the Court would give me no relief, the judge would not recuse
himself, so I felt I had no option." (Milner Depo., at 29-30; Traystman Aff., at ¶9.) Milner never

intended to pay the child support because he did not think he owed it because his ex-wife got

their house in the divorce. (Cannon Depo., at 21.) As a result of his failure to appear, at the

April 24, 1995 hearing, a capias was issued by Judge Teller with a substantial bond set.

(Traystman Aff., at ¶¶8-9.) Thereafter, several attempts were made to serve the capias on

Milner, but these attempts were unsuccessful because Milner had moved out of Connecticut.

(Id., at ¶10.)

     In or about 1996, Milner brought a federal lawsuit against five superior court judges who

he had appeared in front of during these family and divorce proceedings. (Milner Depo., at 32-

35.) Although Milner knew the judges had absolute immunity, his goal in filing the lawsuit was

to force them to recuse themselves. (Id., at 34-35.) The judges never recused themselves. (Id.,

at 36.) This matter was ultimately appealed to the Second Circuit, which affirmed the dismissal

of the action. (Id., at 36, 40-41, 108.)

     Prior to September 30, 2002, on several occasions, Milner explained to Heidi Cannon

("Cannon") that a capias had been issued in post-divorce proceedings with his first wife and

"that some day a marshal could come to the door . . . ." (Cannon Depo., at 17-21; Milner Depo.,

at 76-77.) The first of these conversations took place in January 2000. (Cannon Depo., at 18.)

Milner was aware of the child support enforcement measures that were being undertaken

throughout Connecticut and that he was a candidate for this type of program. (Cannon Depo., at

44; Milner Depo., at 117.) In total, as of September 2002, Milner owed approximately $40,000

in back child support. (Milner Depo., at 26.) After his arrest in 2002, Milner paid approximately

$32,000 in child support in full and final settlement of this obligation. (Milner Depo., at 27;

Traystman Aff., at ¶13.)

Sometime during the 2002 calendar year, Attorney Gary Traystman, counsel for Milner's first wife, learned that Milner had moved back to Connecticut. (Traystman Aff., at ¶11.) Attorney Traystman requested that Marshall Duncklee serve the capias on Milner. (Id., at ¶12; Duncklee Depo., at 24.) For his own protection, Duncklee requested that two sworn officers from the Stonington Police Department accompany him during the service of the capias. (Duncklee Depo., at 25-27.) The two officers were Defendants Bryan Schneider and Michael Peckham. (Id., at 27.) The officers were advised by their supervisor, Sergeant Johnson, that they were to aid Duncklee in assisting an arrest warrant. (Deposition of Michael Peckham ("Peckham Depo."), at 27; Deposition of Bryan Schnerider ("Schneider Depo"), at 26.) Officer Peckham does not recall receiving any specific testing or training on civil capiases. (Peckham Depo., at 9, 12, 48.) In Officer Peckham's opinion, a capias and an arrest warrant are identical. (Id., at 16-18.) Similarly, Officer Schneider received no training at the police academy about the service of a capias. (Schneider Depo., at 39.)

On September 30, 2002, Duncklee and officers Peckham and Schneider arrived at Plaintiff's residence at approximately 9:30 p.m. (Duncklee Depo., at 30-31.) Duncklee served the capias at this time because it is a time when people generally are home. (Id., at 30-31.) Although Plaintiff alleged in his Amended Complaint that when the defendants arrived at the house, he had been working in the basement and Cannon was not aware he was home, (Amended Compl., at 4), in fact, Milner and Cannon were having a glass of wine in front of the fireplace in the kitchen. (Cannon Depo., at 22.)

4

Duncklee knocked at the front door. (Duncklee Depo., at 34.) When Ms. Cannon answered the door, Duncklee identified himself and said he had an arrest warrant for Milner.[2] (Cannon Depo., at 24, 28; Duncklee Depo., at 18, 35-36.) The door was opened a foot or 18 inches. (Cannon Depo., at 25-26.) Duncklee placed part of his foot inside the door so as to prevent it from being slammed and also to enable him to communicate with the person opening the door. (Duncklee Depo., at 35.) Cannon initially told Duncklee that he could not enter the premises. (Cannon Depo., at 27-28.) Additionally, Cannon stated that Milner was not at the residence. (Duncklee Depo., at 36.) In fact, Cannon knew that Milner was inside the residence, but tried to protect him from the marshal. (Cannon Depo., at 31-32.)

Cannon tried to close the door, but was unsuccessful because part of Duncklee's foot was in the threshold. (Id., at 28.) During this time, Duncklee continued to state that he had an arrest warrant for Milner. (Id., at 29.) Duncklee handed Cannon the capias, who looked at it while they were still at the door. (Id., at 29; Duncklee Depo., at 63.) Thereafter, Cannon handed the capias back to Duncklee. (Cannon Depo., at 29.)

After reading the capias, Cannon stopped saying, "you can't come in" and let go of the door and stepped back. (Id., at 31, 49-50.) Duncklee did not use any force to open the door. (Duncklee Depo., at 40.) Contrary to the allegations in Plaintiff's Amended Complaint, Duncklee did not lean against the door or push or move Cannon out of the way. (Id., at 40-43; Cannon Depo., at 31, 50-51, 68-69; Schneider Depo., at 42.) When Duncklee opened the door

---

[2]    Because Milner was in the basement and therefore could neither see nor hear what happened at the door, he lacks personal knowledge to dispute what Duncklee and Cannon both agree took place.

further, he did not move Cannon's foot, rather Cannon stepped back. (Cannon Depo., at 31, 50-51, 68-69.) Duncklee and the co-defendants then entered the house.

Subsequently, Duncklee asked Ms. Cannon if she could show him the garage. (Id., at 32; Duncklee Depo., at 43; Peckham Depo., at 36; Schneider Depo., at 32.) Cannon showed Duncklee where the garage was located. (Cannon Depo., at 32.) Duncklee looked in the garage and discovered Milner's vehicle. (Id., at 33.)

After returning from the garage, Duncklee began to search the second floor of the residence. (Duncklee Depo., at 46-47; Schneider Depo., at 38.) As Duncklee proceeded upstairs, Milner appeared in the foyer and said, "what's going on." (Duncklee Depo., at 46; Milner Depo., at 64.)

Once Milner appeared in the foyer, Duncklee handed him a copy of the capias. (Duncklee Depo., at 47.) Duncklee allowed Milner to make a few phone calls to his attorney, gather some personal belongings and discuss financial issues with Cannon. (Id., at 47-50; Milner Depo., at 69-70.) Duncklee did not handcuff Milner in the house, but instead waited until he and Milner were outside. (Duncklee Depo., at 50; Milner Depo., at 72-73.) Thereafter, Duncklee transported Milner to Corrigan Correctional Facility. (Milner Depo., at 73-74.)

**B.      Procedural Posture**

In 2003, each of the defendants moved to dismiss the Amended Complaint based upon the qualified immunity defense. On September 15, 2003, this Court dismissed Plaintiff's claims for false arrest, false imprisonment and intentional infliction of emotional distress. (Ruling, 9.15.03, at 28, 36, 39.) Further, the Court dismissed Plaintiff's equal protection and due process claims to the extent they relied upon an allegedly false arrest. (Id., at 41-42.) The Court denied

6

Defendants' motions to dismiss as to the remaining claims to the extent that they were grounded in Duncklee's alleged entry into Plaintiff's residence. (Id., at 30-32.) Thereafter, both parties appealed to the Second Circuit, but these appeals were dismissed, as the Second Circuit held that the ruling on the motion to dismiss was not an appealable final judgment. (See Second Circuit Order, 6.3.04, attached hereto as Exhibit 1.) Accordingly, this action returned to this Court and discovery has now been completed.

## II.    ARGUMENT

### A.    Standard For Granting Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)(citations omitted). The essential inquiry is "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id., at 251-52.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(internal quotation marks omitted). "To defeat a motion for summary judgment, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." Tullo v. City of Mt. Vernon, 237 F. Supp. 2d 493, 499 (S.D.N.Y. 2002)(internal quotation marks omitted).

The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)(internal quotation marks omitted). "When, in fact, nothing remains to be tried, a defendant has the right to judgment without the expense of a trial. Courts must protect defendants from oppressive and meritless litigation." Reich v. N.Y. Hosp., 513 F. Supp. 854, 863 (S.D.N.Y. 1981).

**B.    Duncklee Is Entitled To Qualified Immunity For The Acts Alleged In Plaintiff's Revised Complaint.**

In his Amended Complaint, Milner alleges that Duncklee violated his constitutional rights under the Fourth and Fourteenth Amendments by entering his home (along with officers Schneider and Peckham) without consent, and taking him into custody in accordance with a capias issued by the Connecticut Superior Court. (Amended Compl., at 2.) In Plaintiff's view, the capias issued by the Superior Court was not equivalent to an arrest warrant, and therefore, did not grant Duncklee the legal right to enter his residence to seize his person. Because Milner seeks to impose individual liability on Duncklee, the doctrine of qualified immunity is implicated.

It is axiomatic that the qualified immunity defense protects government officials from being personally liable for all civil claims, including Section 1983 claims, where the plaintiff seeks monetary relief. It provides both immunity from liability and immunity from suit, and is intended to shield defendants from discovery and lengthy trial proceedings. See Mitchell v. Forsyth, 472 U.S. 511, 525-27 (1985). Qualified immunity is ultimately a question of law for the court, and is usually decided on summary judgment. Id., at 526.

8

The Supreme Court established the basic test for qualified immunity in <u>Harlow v.</u> <u>Fitzgerald</u>, 457 U.S. 800 (1982). The Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct *does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.*" <u>Id.</u>, at 818 (emphasis added). A right is "clearly established" when "the contours of the right [are] . . . *sufficiently clear* that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)(emphasis added).

Building upon the principles announced in <u>Harlow</u>, the Second Circuit has set forth a three-part analytical framework for assessing claims of qualified immunity. "To be entitled to qualified immunity, the [defendant] . . . [has] the burden of proving, first, that [his] conduct fell within the scope of [his] official duties . . . ." <u>Huminski v. Corsones</u>, 386 F.3d 116, 143 (2d Cir. 2004). Second, the Court "must assess whether [the defendant's] actions violate clearly established rights of which an objectively reasonable official would have known." <u>Ehrlich v.</u> <u>Glastonbury</u>, 348 F.3d 48, 60 (2d Cir. 2003)(internal quotation marks omitted). Finally, even if the defendant's belief was mistaken, "[i]f the [defendant] reasonably believed that the entry did not violate the plaintiff's rights, [he is] entitled to qualified immunity . . . ." <u>Id.</u>, at 60 (internal quotation marks omitted).

**1.      Duncklee's Conduct Fell Within The Scope Of His Duties.**

As an initial matter, there is no dispute that Duncklee was performing a governmental function when he served a valid capias issued by the Connecticut Superior Court. Although a state marshal is required by statute to serve the capias expeditiously, the manner in which this

duty is carried out is left to the discretion of the state marshal.[3]  See General Statutes § 6-32

(stating only that "[e]ach state marshal shall receive process directed to such marshal when

tendered, execute it promptly and make true return thereof. . . .").

Even though state marshals are afforded such discretion, the Plaintiff repeatedly has

attempted to equate the position of state marshal to that of a "process server" in an effort to

support his argument that process served by a state marshal is not equivalent to arrest warrants

served by police officers.  This argument ignores, however, that state marshals, which were

formerly deputy sheriffs, have a distinguished place in Connecticut history.  Indeed, the

Connecticut Supreme Court has noted that, "[t]he office of sheriff antedates the Constitution of

the State, and that instrument, as already noticed, directs that a person shall be appointed to fill

that office."  Sibley v. State, 89 Conn. 682, 684-85 (1915), overruled on other grounds, 196

Conn. 192, 198 (1985).

Moreover, in recounting the origins of the office of sheriff, Zephaniah Swift, in his

Systems of Laws, remarked:  "The sheriff is an officer of great importance in the executive

department of government.  The office is derived to us from England: but the power of it

depends on statutes, which have considerably varied from what is in England."  Zephaniah Swift,

A System of the Laws of the State of Connecticut, vol. 1, p. 90 (1795).  These powers are not

solely limited to the sheriff because "[t]he sheriffs have the power of constituting and appointing

a certain number of deputies, to act under them, who have the same authority as the sheriff. . . ."

Id., at 92.  Therefore, the service of a court-ordered capias by a state marshal (and formerly by a

---

[3]      A state marshal's discretion can be exercised in a variety of ways, including, but not
limited to:  (1) when and where to serve the legal process; (2) whether to ask the assistance of the
local police department; (3) whether to allow the arrestee to contact his attorney or obtain other
personal possessions.

deputy sheriff) certainly involves the performance of a discretionary governmental function. See id. ("[i]t is the duty of the sheriff to attend on all the stated courts within the county, to preserve good order in the court, and to exercise their judgments. In all matters of a criminal nature, it is his duty to carry the judgments of the court into execution, by inflicting such punishment as they order").

### 2.    Duncklee Did Not Violate Plaintiff's Clearly Established Constitutional Rights.

At the core of Plaintiff's Amended Complaint is his contention that Marshal Duncklee and officers Peckham and Schneider violated his constitutional rights when they allegedly entered his residence without an "arrest warrant." Specifically, Plaintiff argues that Duncklee's entry and subsequent search constituted a warrantless search in light of the fact that Duncklee only possessed a civil capias. This argument should be rejected.

Plaintiff's constitutional claims arise out of a nucleus of facts, which are undisputed. It is undisputed that Plaintiff intentionally failed to make a court appearance in 1995. (Milner Depo., at 29-30; Traystman Aff., at ¶¶9-10.) Thereafter, the Connecticut Superior Court issued a capias for his arrest. (Traystman Aff., at ¶10.) This capias was not served until 2002 because Milner had left Connecticut for an extended period of time.[4] (Id., at ¶11.) When Milner returned, Marshal Duncklee was instructed to serve the capias at Plaintiff's residence in Stonington. (Id., at ¶14; Duncklee Depo., at 24.)

On September 30, 2002, at 9:30 p.m., Duncklee, accompanied by Peckham and Schneider, knocked on the door of Plaintiff's residence. (Duncklee Depo., at 30-31, 34.)

---

[4]    Even leaving these reasons for delay in service aside, there is no dispute that the capias remained valid in 2002.

Cannon opened the door of the residence. Marshal Duncklee immediately identified himself and stated that he had an "arrest warrant" for Plaintiff. (Cannon Depo., at 24, 28; Duncklee Depo., at 18, 35-36.) After indicating that Milner was not home, Ms. Cannon attempted to close the door, but was unable to do so because a part of Duncklee's foot was over the threshold. (Cannon Depo., at 28, 31-32.) During this time, Marshal Duncklee handed the capias to Cannon and after she read it, she let go of the door, stepped back and Duncklee and the officers entered. (Id., at 29, 31, 49-50.) After a search of the home was commenced, Milner came into the foyer and was placed under arrest. (Milner Depo., at 58-59, 64.)

Based upon these facts, Plaintiff claims that he was the victim of an unreasonable search and seizure in violation of the Fourth Amendment. Importantly, however, while it is well-established that the Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures"; U.S. Const. amend. IV; this right is not without limits. Rather, the Supreme Court has recognized that an arrest warrant "authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home." Steagald v. United States, 451 U.S. 204, 214 n.7 (1981). Put another way, "[a]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe that the suspect is within." United States v. Lovelock, 170 F.3d 339, 343 (2d Cir. 1999)(quoting Payton v. New York, 445 U.S. 573, 603 (1980).[5] Indeed, an arrest warrant would be ineffective if it did

---

[5]    In order to assess the reasonableness of an officer's belief that a suspect may be within a dwelling, the Second Circuit has held that "the proper inquiry is whether there is a reasonable belief that the suspect resides at the place to be entered to execute [the] warrant, and whether the officers have reason to believe that the suspect is present." Lovelock, 170 F.3d at 343 (internal quotation marks omitted). Importantly, "[t]he officer's belief need not be correct, only

not carry such authority.  See United States v. Stinson, 857 F. Supp. 1026, 1029 (D. Conn.

2003).  Thus, under such circumstances, a separate search warrant is not necessary.  United

States v. Lauter, 57 F.3d 212, 214 (2d. Cir. 1995); Lovelock, 170 F.3d at 344 (noting that while a

search warrant is required when officers enter the home of a third party, the Supreme Court in

Steagald "did not . . . prohibit entry into a residence reasonable believed to belong to the person

*named* in the arrest warrant")(emphasis added).

Nevertheless, Plaintiff claims that this limited right of entry afforded to "arrest warrants"

is not applicable because a capias is not a warrant.  To support this argument, Plaintiff sets forth

two primary arguments.  First, Plaintiff relies on the text of General Statutes § 54-2a to support

his claim that capiases are issued only in civil matters, and therefore, are not equivalent to

"criminal" arrest warrants.  Secondly, Plaintiff relies heavily on the omission of the word

"warrant" from the capias form that was issued for his arrest.  Each of these arguments should be

rejected because they attempt to draw artificial lines between "capiases" and "warrants" that

have never existed in either the common law or the Connecticut General Statutes.

### a.    Historical Origins Of A Capias

The term "capias" is defined by Black's Law Dictionary as "[a]ny of various types of

writs that require an officer to take a named defendant into custody."  Black's Law Dictionary

(7th ed. 2000).  Historically, the writ of capias was designed to ensure a defendant's attendance

---

reasonable."  Tyson v. Willauer, 289 F. Supp. 2d 190, 197 (D. Conn. 2003).  In the case at hand,
it was reasonable for Duncklee to conclude that Milner resided at Trolley Crossing Road given
that this address was listed on a valid capias.  Id.

In addition, it was reasonable for Duncklee to expect that Milner would be home at 9:30
p.m..  See id. (holding that "once agents have a reason to believe that a suspect lives in a
particular dwelling, they may reasonably infer that he will be home early in the morning"); see
also Smith v. Tolley, 960 F. Supp. 977, 988 (E.D. Va. 1997)(holding that it was reasonable for
officer to presume that plaintiff would be home at 10:30 p.m. on a Monday night).

at court proceedings, either before or after they commenced. Writs of capias were issued for a broad range of civil proceedings including for the collection of debts (*extendi facias*), unpaid fines (*pro fine*), and unsatisfied judgments (*ad satisfaciendum*). The most common type of civil capias was a *capias ad respondendum*, in which a sheriff would take a civil defendant into custody prior to the commencement of the proceedings. This type of process has now been replaced by personal service of summons. Burnham v. Superior Court of California, 495 U.S. 604, 618 (1995).

While a writ of capias has often only been associated with "civil process," the writ was used in criminal proceedings as well. Notably, at common law, a capias was issued after a party was indicted for treason or for a felony. Blackstone, Commentaries (Chapter 24 – Indictments) ("[o]n indictments for treason or felony, a capias is the first process. . . ."); see also United States v. Burr, 25 F. Cas. 187, 188 (Cir. Ct. Va. 1807) (Chief Justice Marshall)(citing Blackstone's Commentaries, refers to the English practice of issuing a "writ of capias" after an indictment for a misdemeanor.) Therefore, the English common law contemplated that a capias could be issued as either criminal or civil process.

In recognition of the variety of proceedings that a capias could be employed, the terms, "warrant" and "capias," have often been intermingled both by the courts and by various state legislatures. One of the first examples of this intermingling occurred in United States v. Burr, authored by Chief Justice John Marshall, who in analogizing to a previous Supreme Court case, remarked, "a capias, or what is the same thing, a bench warrant was issued." Burr, 25 F. Cas. at 189.

Consistent with Chief Justice Marshall's description, in recent times, the intermingling of the terms, "capias" and "warrant" has continued. For example, in 2004, Judge Burns, in an action against a federal marshal, noted, "[d]ue to the Plaintiff's total failure to respond to the subpoena enforcement action, a capias, *or a civil arrest warrant*, was issued . . . ." Eck. v. Gallucci, 321 F. Supp. 2d 368, 370 (D. Conn. 2004)(emphasis added). Clearly, this statement reinforces the proposition that a capias and a warrant can be one in the same.

This commingling of terms is not limited to cases in the District of Connecticut. For instance, the Fifth Circuit has noted: "The capias . . . [is] Texas' equivalent to an arrest warrant which is issued by the court or clerk and directed 'To any peace officer of the State of Texas. . . .'" Smart v. Jones, 530 F.2d 64, 66 (5th Cir. 1976)(internal quotation marks omitted); see also United States v. Hickman, 1996 U.S. App. LEXIS 8766, at *2 n.1 (4th Cir. 1996)(unpublished) ("[i]n Virginia a capias is the functional equivalent of an arrest warrant. See Va. Code Ann. § 19.2-80 (Michie 1995)"); Heine v. Connelly, 644 F. Supp. 1508, 1511 (D. Del. 1986)(noting that capias issued for defendant who failed to appear on misdemeanor complaint "is essentially a bench warrant for the arrest of [the] accused. . . .") As a result, because courts and state legislatures have declined to draw artificial lines between capiases and warrants, Plaintiff's arguments are unavailing.

### b.    Treatment Of Capiases Under Connecticut Law

Consistent with this case law, the Connecticut General Statutes provides for the issuance of capiases in both criminal and civil matters. Nevertheless, Plaintiff has relied on General Statutes § 54-2a to support his argument that a warrant is for criminal process and a capias is for

"civil process." As a matter of statutory interpretation, Plaintiff maintains that subsections (a)(1) and (a)(3) make a clear distinction between criminal arrests and civil arrests.

The Plaintiff has misread Section 54-2a. Contrary to Plaintiff's assertion, Section 54-2a applies <u>only</u> to criminal cases and therefore, cannot apply to the capias issued as part of the underlying divorce proceedings. The application of Section 54-2a to criminal cases is supported by three different reasons.

First, the introductory clause of Section 54-2a (a) clearly states that Superior Court judges have authority "in all criminal cases" to issue bench warrants, subpoenas, and capiases. There is no indication in the statute that this authority extends to civil cases.

Secondly, subsection (a)(4), which is the "catch-all" provision, states that in addition to issuing bench warrants, subpoenas, and capiases, a trial court can also issue "all other criminal process. . . ." General Statutes § 54-2a (a)(4). Therefore, in the context of this statute, it is reasonable to conclude that the previously listed powers are all "criminal process."

Finally, it is noteworthy that the statute is located in Title 54, aptly named, "Criminal Procedure." As a result, a fair and balanced reading of Section 54-2a reveals that a capias issued pursuant to this statute must be characterized as "criminal process." <u>See also</u> <u>State v. Rivera</u>, 268 Conn. 351, 376 n.22 (2004) ("*[i]n a criminal trial,* if a witness violates a court order regarding any court appearance, that witness may be taken into custody pursuant to a capias issued by the trial court. See General Statutes § 54-2a (a)(3). . . .")(emphasis added).[6]

---

[6]    Although an arrest could theoretically be described as criminal in nature, the Connecticut Supreme Court has consistently looked to the end of the action (*i.e.,* recovery for civil injury) when assessing whether criminal or civil process has been issued. <u>See</u> <u>Hinman v. Taylor</u>, 2 Conn. 357, 360-61 (1817); <u>Kuser v. Orkis</u>, 169 Conn. 66, 71-72 (1975). In the case at hand, it is undisputed that the purpose of the underlying divorce proceedings was to achieve a civil remedy,

Even though Section 54-2a is not directly applicable to this case, the statute still sheds light on the relationship between capiases and arrest warrants. Contrary to Plaintiff's view, the text of the statute does not reveal that a bench warrant is to be treated differently from a capias merely because they are located in separate subsections. [7] Rather, the distinction drawn by the statute is based upon the *type* of the information that is required for the issuance of each form of process. In order to attain a bench warrant, an officer must submit an application that "shows that there is probable cause to believe that an offense has been committed and that the person complained against committed it. . . ." See General Statutes § 54-2a (a)(1). This application process is not necessary when a defendant fails to appear as the court itself witnesses this event. Therefore, probable cause is implicit in the Court's issuance of a capias.

Moreover, the legislative history of § 54-2a further undermines Plaintiff's claims that a clear line of demarcation exists between a capias and arrest warrant. Prior to 1984, the statute granted the trial court authority to issue "warrants of capias" for witnesses who failed to appear (the power to issue capiases for parties who did comply with a court order did not exist until 1984). In addition, prior to 1977, the statute explicitly grouped arrest warrants and capias warrants together, as it permitted trial courts to issue "warrants of capias for witnesses [and]

---

*i.e.*, recovery of unpaid child support. Therefore, the process issued by the Superior Court must be considered "civil" in nature.

It appears that the Superior Court issued the capias at issue pursuant to one of the other multiple sources of statutory authority under which a court may issue such a capias. See, e.g., General Statutes § 46b-231. Alternatively, the Court may have issued the capias by invoking its common law authority to enforce its own orders. See In re Prenick, 19 Conn. App. 340, 347 (1989).

[7] Indeed, it is noteworthy that the statute that governs warrantless arrests does not mention capiases. See General Statutes § 54-1f. Rather, the capias procedure is described in § 54-2a, which deals with the issuance of warrants.

warrants of arrest upon complaints made of crimes. . . ."[8]  General Statutes § 54-2a (Rev. 1975).

Notably, the legislative history during this time period is silent as to any perceived differences

between the two "warrants."

In 1984, Section 54-2a was amended in two major ways.  First, the legislature removed

the phrase "warrants of" before the word "capias" in the statute.  Secondly, the legislature

expanded the trial court's capias power by allowing for the issuance of a capias for witnesses <u>and</u>

"for defendants who violate an order of the court regarding any court appearance. . . ."  General

Statutes § 54-2a (a)(3).  Importantly, the legislature did not articulate any rationale for its

deletion of the words "warrants of" from the subsection relating to capiases.  This legislative

silence suggests that the deletion was a technical revision and therefore, the words "warrant of"

are simply subsumed in the term "capias."  Indeed, there is no evidence that suggests that the

legislature was contemplating a major substantive change to its treatment of capiases after 1984.

---

[8]      Section § 54-2a was amended several times from 1975 to 1984.  Importantly, the use of
the phrase, "warrants of capias" remained throughout all of the amendments.  The following are
excerpts of the statute after each substantive amendment:
        Section 54-2a (Rev. 1975): "In all criminal cases the court of common pleas, or any judge
thereof, may issue subpoenas and *warrants of capias for witnesses, warrants of arrest* upon
complaints made of crimes, and all other criminal process, and administer justice in all criminal
matters whereof said court has jurisdiction. . . ."  (emphasis added).
        Section 54-2a (Rev. 1979): "In all criminal cases the superior court, or any judge thereof,
may issue subpoenas and *warrants of capias for witnesses, bench warrants of arrest* upon
complaints made of crimes, and all other criminal process, and administer justice in all criminal
matters. . . ."  (emphasis added).
        Section 54-2a (Rev. 1983): "(a) In all criminal cases the superior court, or any judge
thereof, may issue (1) bench warrants of arrest upon application by a prosecutorial official if the
court or judge determines that the affidavit accompanying the application shows that there is
probable cause to believe that an offense has been committed and that the person complained
against committed it, (2) subpoenas and *warrants of capias* for witnesses and (3) all other
criminal process; and may administer justice in all criminal matters."  (emphasis added).

Importantly, the legislative history does provide guidance as to the rationale for
expanding the capias power to defendants who failed to appear for a court appearance. For
example, during Senate proceedings, the legislator who introduced the bill, noted:

> This Bill would allow the court to issue a capias in certain situations rather than
> using [a] more formal criminal arrest warrant. The situations covered in the Bill
> are when the accused in a criminal case has failed to appear in court for trial,
> violated any court order regarding appearance or forfeited bond.

See 27 Senate Proc., Pt. 4, 1984 Sess., p. 1393-94, remarks by Senator Owens, relevant excerpts
attached hereto as Exhibit 2. Consistent with the text of the statute, this passage reveals that the
legislature intended to alleviate the burden on the trial court by avoiding the "formality" of
having an officer appear before it even in situations where the court itself had direct knowledge
of the defendant's failure to appear or violation of a court order.

The proceedings before the Judiciary Committee also emphasize that these amendments
were designed to enhance judicial efficiency. Judge Aaron Ment, who was the Chief Court
Administrator at the time, explained to the committee that:

> Presently, when a defendant does not appear the judge has no alternative but to
> issue a rearrest and in some cases it's a cumbersome and difficult process which
> does not always result in the defendant being brought to court. *This would simply
> give the judge a second arrow in which he can attempt to have the court's orders
> complied with.*

See Interim Hearings of the Judiciary Committee, Pt. 2, 1983-84 Interim Sess., p. 596, relevant
excerpts attached hereto as Exhibit 3 (emphasis added). Thus, contrary to Plaintiff's claims,
these statements reveal that the legislature intended to afford equal status to these "two arrows,"
rather than impose artificial boundaries between the two forms of process.

     **c.**     **The Issuance Of A Capias Satisfies The "Probable Cause" Requirement In The Fourth Amendment.**

It is axiomatic that an arrest warrant or a capias must be supported by probable cause because an "arrest," is considered a seizure under the Fourth Amendment.  See California v. Hodari D., 499 U.S. 621, 624-627 (1991).  The policy rationale for requiring that a warrant may only be issued after a determination of probable cause by a neutral and detached magistrate was set forth by the Supreme Court in Steagald v. United States, 451 U.S. 204 (1981).  The Court explained:

> The purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest or conduct a search.  As we have often explained, the placement of this checkpoint between the Government and the citizen implicitly acknowledges that an 'officer engaged in the often competitive enterprise of ferreting out crime' . . . may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty and the privacy of his home.

Id., at 212 (citation omitted).  Clearly, by its very nature, a capias is not issued in classic "arrest warrant" fashion.  Indeed, an officer does not submit an application to the Superior Court, which asserts that a party committed a crime, and as a result, a warrant should be issued.

Rather, the issuance of a capias is preceded by an independent finding of probable cause by the Superior Court.  There is no dispute that the Plaintiff failed to appear at the 1995 hearing.  Rather than relying on an *ex parte* presentation of evidence by police officers, the Superior Court had the opportunity to witness this failure to appear firsthand.  Indeed, Plaintiff has never claimed that the capias that was issued was not valid.  (Traystman Aff., at ¶13.)

In addition, for purposes of the Fourth Amendment, there is no question that a Superior Court Judge is properly considered a neutral and detached magistrate.  Unlike an officer engaged

in the competitive enterprise of ferreting out crime, the Superior Court was not involved in such a pursuit. As a result, the Supreme Court's concern about overly zealous police officers is simply not relevant to this case. Indeed, if the Court held to the contrary, a new rule would be created whereby a judge, before issuing a capias, would have to find another Superior Court judge to rule on the validity of that order. In practical terms, the Superior Court judge issuing the capias would be put in the place of a police officer seeking a search warrant. Not only would two judges need to be involved each time a capias is issued, but each Superior Court judge would have to halt his or her proceedings every time a capias was necessary. Such a result would be illogical. See United States v. Ventresca, 380 U.S. 102, 108 (1965)(recognizing that the "Fourth Amendment commands, like all constitutional requirements, are practical and not abstract").

Ultimately, if the Court were to hold that a capias is not functionally equivalent to a warrant, the Connecticut Superior Court would be stripped of its authority to enforce its own orders. Defendants could simply avoid arrest by remaining in their homes for an indefinite period. Such a result, which would be based on an arbitrary line of demarcation, would undermine efforts by the State to ensure that parties are held responsible for failing to pay child support and other obligations. Accordingly, because Duncklee's conduct did not violate Plaintiff's clearly established rights, Duncklee is entitled to qualified immunity at to all counts of Plaintiff's Amended Complaint.

### 3. It Was Reasonable For Duncklee To Conclude That He Could Enter Plaintiff's Residence Pursuant To A Capias Issued By The Superior Court.

Even if this Court determines that as a matter of law, a capias is not equivalent to an "arrest warrant" and therefore, does not permit Duncklee's entry, Duncklee should still be

afforded qualified immunity. Because Duncklee "reasonably believed that the entry did not

violate the plaintiff's rights, [he is] entitled to qualified immunity . . . ." Ehrlich, 348 F.3d at 60

(internal quotation marks omitted).

As illustrated above, *supra*, capiases and arrest warrants have historically been

intermingled. Indeed, as recently as 2004, the District of Connecticut has referred to a capias as

a "civil arrest warrant." Therefore, if this Court changes course, or clarifies for the first time in

Connecticut that a capias is not a warrant, such a holding would not necessarily mean that the

law was clearly established on September 30, 2002. As of that date, only a few Connecticut

cases, both decided before the early 1900s, even addressed this issue. See e.g., Fourette v.

Griffen, 92 Conn. 388, 391 (1918); Fitch v. Loveland, 1 Kirby 380, 386-87 (Conn.

1788)(Ellsworth, J., dissenting). Notably, both of those cases involved circumstances in which

an officer broke an outer door, which did not occur in this case. (Duncklee Depo., at 40-43;

Cannon Depo., at 31, 50-51, 68-69; Schneider Depo., at 42.)

In addition to the dearth of case law, Duncklee and the officers were hampered by the

fact that they did not receive any training that even suggested that a capias was different than an

arrest warrant. (Duncklee Depo., at 11-12; Peckham Depo., at 9, 12, 48; Schneider Depo., at 39.)

Rather, both Duncklee and Peckham testified that based on their training, they understood that a

capias and an arrest warrant are identical. (Duncklee Depo., at 16; Peckham Depo., at 16-18.)

Indeed, James Neil, who presently serves as Director of Operations for the State Marshal

Commission, when shown the capias issued to Milner, identified it as "capias warrant."

(Deposition of James Neil, at 23, relevant excerpts is attached hereto as Exhibit 4.).

Accordingly, given the state of the law in 2002, it was not unreasonable for Duncklee to enter the

residence and conduct a limited search for the Plaintiff pursuant to the authority of the capias

issued by the Connecticut Superior Court. Therefore, Duncklee is entitled to qualified immunity

as to all counts in Plaintiff's Revised Complaint.

**C.      Summary Judgment Should Be Granted On Plaintiff's Equal Protection, Due Process & 42 U.S.C. § 1983 Claims.**

Plaintiff's Amended Complaint also alleges violations of his rights to Equal Protection

(Claim 2), Due Process (Claim 2), and for damages under 42 U.S.C. § 1983 (Claim 3). This

Court has already ruled that these claims are viable only to the extent that they relate to the entry

of Duncklee and the officers into Plaintiff's residence. (Ruling, at 30-32, 40-41) As discussed

above, *supra*, each of these claims fails because they all hinge on the faulty premise that

Duncklee violated Plaintiff's constitutional rights when he entered Plaintiff's residence pursuant

to a valid capias issued by the Connecticut Superior Court.

Even if this Court were to find that qualified immunity is not applicable, Plaintiff's Equal

Protection claim still fails. It is well established that "[t]he Equal Protection Clause of the

Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be

treated alike." Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). In order to

establish an Equal Protection claim, the Plaintiff must show that "(1) the person, compared with

others similarly situated, was selectively treated; and (2) . . . such selective treatment was based

on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of

constitutional rights, or malicious or bad faith intent to injure a person." Crowley v. Courville,

76 F.3d 47, 52-53 (2d Cir. 1996).

The Plaintiff has neither alleged nor provided any evidence that establishes that Duncklee

treated him differently based on his race or religion. Moreover, there is no evidence that even

suggests that Duncklee intended to punish the exercise of Plaintiff's constitutional rights.

Rather, all the available evidence reveals that Duncklee followed standard operating procedure

by obtaining a police presence and arriving at Plaintiff's residence at a time when people

generally are home.

Importantly, "because [the Plaintiff] does not allege selective treatment based upon his

race, religion, or any intentional effort by the [defendant] to punish him for exercising his

constitutional rights, [the Plaintiff] *must demonstrate* that [the defendant] maliciously singled

him out . . . with the intent to injure him." Id., at 53 (emphasis added).  Plaintiff has made no

such showing.  There is no evidence that even suggests that Duncklee had any intent other than

to serve a validly issued capias.  Accordingly, summary judgment should be granted as to

Plaintiff's Equal Protection claim.

**D.      Plaintiff's State Law Tort Claims (Count Four) Are Also Barred By The Doctrine Of Qualified Immunity.**

In his Amended Complaint, Plaintiff sets forth various state law claims including "false

representation" and "trespass." (See Count IV.)  As this Court noted in its September 13, 2003

ruling, these claims were permitted to proceed to the extent that they related to the allegedly

unlawful entry. (Ruling, at 36.)  As a result, it is clear that these claims arise from the same

factual allegations relied upon in Plaintiff's constitutional claims.  Therefore, if this Court grants

summary judgment as to Plaintiff's constitutional claims, Plaintiff's pendant state law claims

should be dismissed as well.[9]

---

[9]      Alternatively, the Court could also decide not to exercise jurisdiction over Plaintiff's state law claims.  See Zeppieri v. New Haven Provision Co., 163 F. Supp. 2d 126, 139-40 (D. Conn. 2001)(declining to exercise supplemental jurisdiction over remaining state law claims after court dismissed claims over which it had original jurisdiction).

Importantly, however, even if this Court were to find that qualified immunity is not applicable, Plaintiff's "false representation" claim is still ripe for summary judgment. In his Amended Complaint, Plaintiff alleges that "Ms. Cannon was deceived by Defendant Duncklee's false representation that he had an 'arrest warrant' as stated in Claim I. . . ." (Amended Compl., at 8.) It appears that Plaintiff's claim for "false representation" is in actuality a claim for fraudulent misrepresentation. "The essential elements of an action in common law fraud . . . are that (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Investors, L.P., 260 Conn. 766, 777 (2002)(internal quotation marks omitted). Plaintiff has not satisfied these elements.

First, it is undisputed that the "false" misrepresentation was made to Cannon (a non-party) rather than the Plaintiff. (Amended Compl., at 8.) As a result, Plaintiff is unable to establish that he himself was induced to act upon this allegedly false representation. See Suffield, 260 Conn. at 778 (holding that plaintiff had failed to satisfy elements of fraud "because the allegedly false representation was not made to the plaintiff. . . .").

In addition, Plaintiff has not established that Duncklee knew on the date of the incident that an "arrest warrant" was not equivalent to a capias. Indeed, Duncklee has testified that based on his prior training, he believes that a capias is a valid arrest warrant. (Duncklee Depo., at 16.) Accordingly, summary judgment is appropriate as to Plaintiff's fraudulent misrepresentation claim.

Similarly, Plaintiff's common law trespass claim is unavailing. It is well established that "[i]n order to recover on a claim for trespass under the common law, a plaintiff must show ownership or possessory interest in property; the physical invasion, entry or intrusion by defendant which affects the plaintiff's possessory rights; intent to do that which causes the invasion *and a direct injury to the plaintiff's property*." Day v. Gabriele, No. CV030196802S, 2005 Conn. Super. LEXIS 2100, at *14 (Conn. Super. Ct. Aug. 10, 2005)(emphasis added). Plaintiff has not alleged, must less presented evidence, of a "direct injury to [his] property." Id.; see also Lake Garda Improvement Ass'n v. Battistoni, 160 Conn. 503, 516 (1971)(holding that "[a] trespass on real estate is the doing of a direct injury *to property* by force")(emphasis added). Rather, all of the injuries described in his Amended Complaint are properly characterized as personal injuries. As a result, summary judgment should be granted as to Plaintiff's trespass claim.

## III.    <u>CONCLUSION</u>

Based on the foregoing reasons, Defendant Lester Duncklee, respectfully requests that

this Court grant his motion for summary judgment on all counts of Plaintiff's Amended

Complaint.


**DEFENDANT,**
**LESTER DUNCKLEE**


By _____
Rhonda J. Tobin (ct 07755)
rtobin@rc.com
Jeffrey J. White (ct 25781)
jwhite@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing was mailed, postage prepaid, on this 6th day

of February, 2006, to:

Mr. Steven Milner, pro se
40 Trolley Crossing
PO Box 25
Stonington, CT 06378

Scott M. Karsten
Karsten & Dorman, LLC
29 South Main Street, 2nd Floor South
P.O. Box 270722
West Hartford, CT 06107

Jeffrey J. White