UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| STEVEN MILNER and HEIDI CANNON, : | |
| : | |
| Plaintiffs, : | |
| V. : | CIVIL NO. 3:02CV01929(SRU) |
| : | |
| LESTER DUNCKLEE, ET AL. : | |
| : | |
| Defendants. : | FEBRUARY 6, 2006 |

**DEFENDANT LESTER DUNCKLEE'S LOCAL RULE 56(a)(1) STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Lester Duncklee submits the following Local Rule 56(a)(1) Statement of Undisputed Material Facts in support of his Motion for Summary Judgment:

1. Lester Duncklee was and is a Connecticut State Marshal. (Deposition of Lester Duncklee ("Duncklee Depo."), at 4, relevant excerpts attached hereto as Exhibit A.)

2. Before the state marshal system was created, Duncklee had been a deputy sheriff. (Id., at 4-5.)

3. Duncklee is a member of the state marshal capias team. (Id., at 12.)

4. Duncklee did not receive formal classroom training on civil capiases during his tenure as either a deputy sheriff or state marshal. (Id., at 11.)

5. Rather, Duncklee received on-the-job training under the direct supervision of other deputy sheriffs. (Id., at 11-12.)

6. As part of this on-the-job training, Duncklee observed other deputy sheriffs serve capiases and was instructed on how it was done and why it was done. (Id.)

7. Based on his prior training, Duncklee believes that a capias is a valid arrest warrant. (Id., at 16.)

8. Plaintiff Steven Milner's ("Milner") first marriage ended in 1992. (Deposition of Steven Milner ("Milner Depo."), at 13, relevant excerpts attached hereto as Exhibit B.)

9. As part of his divorce, Milner was required to pay a total of approximately $250.00 per week in child support for his three children. (Id., at 24; see also Affidavit of Gary B. Traystman, Esq. ("Traystman Aff."), at ¶5.)

10. In or about 1994 or 1995, Milner unsuccessfully attempted on several occasions to modify this amount. (Milner Depo., at 25.)

11. Milner's final unsuccessful attempt to modify his child support obligation was made before Connecticut Superior Court Judge Samuel Teller in 1995. (Id., at 108.)

12. Contrary to a court order, Milner stopped paying child support. (Id., at 25; Deposition of Heidi Cannon ("Cannon Depo."), at 45, relevant excerpts attached hereto as Exhibit C; Traystman Aff., at ¶6.)

13. Thereafter, a contempt citation was served on Milner and a hearing was scheduled before Judge Teller, who had been actively involved in the divorce proceedings. (Traystman Aff., at ¶¶7-8.)

14. On April 24, 1995, Milner knew that he was required to appear before Judge Teller in Connecticut Superior Court for failure to pay child support, but he did not appear because "I knew I couldn't pay the money, the Court would give me no relief, the judge would not recuse himself, so I felt I had no option." (Milner Depo., at 29-30; Traystman Aff., at ¶¶9-10.)

15. In addition, Milner never intended to pay the child support because he did not think he owed it because his ex-wife got their house in the divorce. (Cannon Depo., at 21.)

16. As a result of his failure to appear, a capias was issued by Judge Teller. (Traystman Aff., at ¶9.)

17. Thereafter, several attempts were made to serve the capias on Milner, but these attempts were unsuccessful because Milner had moved out of state. (Id., at ¶10.)

18. In or about 1996, Plaintiff Milner brought a federal lawsuit against five superior court judges who he had appeared in front of during these divorce proceedings. (Milner Depo., at 32-35.)

19. Although Milner knew the judges had absolute immunity, his goal in filing the lawsuit was to force them to recuse themselves. (Id., at 34-35.)

20. The judges never recused themselves. (Id., at 36.)

21. This matter was ultimately appealed to the Second Circuit, which affirmed the dismissal of the action. (Id., at 36, 40-41, 108.)

22. Prior to September 30, 2002, on several occasions, Milner explained to Cannon that a capias had been issued in post-divorce proceedings with his first wife and "that some day a marshal could come to the door . . . ." (Cannon Depo., at 17-21; Milner Depo., at 76-77.)

23. The first of these conversations took place in January 2000. (Cannon Depo., at 18.)

24. Prior to September 30, 2002, Milner was aware of the child support enforcement measures that were being undertaken throughout Connecticut and that he was a candidate for this type of program. (Cannon Depo., at 44; Milner Depo., at 117.)

25. In total, Milner owed approximately $40,000 in back child support. (Milner Depo., at 26.)

26. After his arrest in 2002, Milner paid approximately $32,000 in child support in and full and final settlement of this obligation. (Milner Depo., at 27; Traystman Aff., at ¶13.)

27. Sometime during the 2002 calendar year, Attorney Gary Traystman, counsel for Milner's first wife, learned that Milner had moved back to Connecticut. (Traystman Aff., at ¶11.)

28. After learning Milner's residential whereabouts, Attorney Traystman requested that Marshall Duncklee serve the capias on Milner. (Id., at ¶12; Duncklee Depo., at 24.)

29. For his own protection, Duncklee requested that two sworn officers from the Stonington Police Department accompany him during the service of the capias. (Duncklee Depo., at 25-27.)

30. The two officers were Defendants Bryan Schneider and Michael Peckham. (Id., at 27.)

31. The officers were advised by their supervisor, Sergeant Johnson, that they were to aid Duncklee in assisting an arrest warrant. (Deposition of Michael Peckham ("Peckham Depo."), at 27, relevant excerpts attached hereto as Exhibit D; Deposition of Bryan Schneider ("Schneider Depo"), at 26, relevant excerpts attached hereto as Exhibit E.)

32. Officer Peckham did not recall receiving any specific testing or training on civil capiases. (Peckham Depo., at 9, 12, 48.)

33. Officer Peckham testified that in his opinion, a capias and an arrest warrant are identical. (Id., at 16-18.)

34. Similarly, Officer Schneider received no training at the police academy about the service of a capias. (Schneider Depo., at 39.)

35. On September 30, 2002, Duncklee and officers Peckham and Schneider arrived at Plaintiff's residence at approximately 9:30 p.m. (Duncklee Depo., at 30-31.)

36. Duncklee served the capias at this time because it is a time when people generally are home. (Id., at 30-31.)

37. Although Plaintiff alleged in his Amended Complaint that when the defendants arrived at the house, he had been working in the basement and Cannon was not aware he was home, (Amended Compl., at 4), in fact, Milner and Cannon were having a glass of wine in front of the fireplace in the kitchen. (Cannon Depo., at 22.)

38. Duncklee knocked at the front door. (Duncklee Depo., at 34.)

39. When Cannon answered the door, Duncklee identified himself and said he had an arrest warrant for Milner. (Cannon Depo., at 24, 28; Duncklee Depo., at 18, 35-36.)

40. The door was opened a foot or 18 inches. (Cannon Depo., at 25-26.)

41. Duncklee placed part of his foot inside the door so as to prevent it from being slammed and also to enable him to communicate with the person opening the door. (Duncklee Depo., at 35.)

42. Cannon initially told Duncklee that he could not enter the premises. (Cannon Depo., at 27-28)

43. Additionally, Cannon stated that Milner was not at the residence. (Duncklee Depo., at 36.)

44. Cannon knew that Milner was inside the residence, but tried to protect him from the marshal. (Cannon Depo., at 31-32.)

45. Cannon tried to close the door, but was unsuccessful because part of Duncklee's foot was in the threshold. (Id., at 28.)

46. Duncklee showed Cannon the capias, and she looked at it while they were still at the door. (Id.; Duncklee Depo., at 63.)

47. Thereafter, Cannon handed the capias back to Duncklee. (Cannon Depo., at 29.)

48. After reading the capias, Cannon stopped saying, "you can't come in" and let go of the door and stepped back. (Id., at 31, 49-50.)

49. Duncklee did not use any force to open the door. (Duncklee Depo., at 40.)

50. Contrary to the allegations in Plaintiff's Amended Complaint, Duncklee did not lean against the door or push or move Cannon out of the way. (Id., at 40-43; Cannon Depo., at 31, 50-51, 68-69; Schneider Depo., at 42.) When Duncklee opened the door, he did not move Cannon's foot, rather Cannon stepped back. (Cannon Depo., at 31, 50-51, 68-69.)

51. Duncklee asked Cannon if she could show him the garage. (Id., at 32; Duncklee Depo., at 43; Peckham Depo., at 36; Schneider Depo., at 32.)

52. Cannon showed Duncklee where the garage was located. (Cannon Depo., at 32.)

53. Duncklee looked in the garage and discovered Milner's vehicle. (Id., at 33.)

54. After returning from the garage, Duncklee began to search the second floor of the residence. (Duncklee Depo., at 46-47; Schneider Depo., at 38.)

55. After Duncklee proceeded upstairs, Milner appeared in the foyer and said, "what's going on." (Duncklee Depo., at 46; Milner Depo., at 64.)

56. After Milner appeared in the foyer, Duncklee handed him a copy of the capias. (Duncklee Depo., at 47.)

57. Duncklee allowed Milner to make a few phone calls to his attorney, gather some personal belongings, and discuss financial issues with Cannon. (Duncklee Depo., at 47-50; Milner Depo., at 69-70.)

58. Duncklee did not handcuff Milner in the house, but instead waited until they were both outside. (Duncklee Depo., at 50; Milner Depo., at 72-73.)

59. Thereafter, Duncklee transported Milner to Corrigan Correctional Facility. (Milner Depo., at 73-74.)

DEFENDANT,
LESTER DUNCKLEE

By _____
Rhonda J. Tobin (ct 07755)
rtobin@rc.com
Jeffrey J. White (ct 25781)
jwhite@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed, postage prepaid, on this 6th day of February, 2006, to:

Mr. Steven Milner, pro se
40 Trolley Crossing
PO Box 25
Stonington, CT 06378

Scott M. Karsten
Karsten & Dorman, LLC
29 South Main Street, 2nd Floor South
P.O. Box 270722
West Hartford, CT 06107

_____
Jeffrey J. White