EXHIBIT A

DUNCKLEE.txt

1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3    _____

4

5    STEVEN MILNER and HEIDI CANNON,         )
                                             )
6                        Plaintiff,          )
                                             )
7                   vs.              )3:02CV1929 (JCH)
                                             )
     LESTER DUNCKLEE, individually and )
8    official capacity,                      )
     BRYAN SCHNEIDER, individually and )
9    official capacity,                      )
     MICHAEL PECKHAM, individually and )
10   official capacity,                      )
                                             )
11                       Defendants.         )
                                             )
12   _____)

13

14

15

16         Deposition of LESTER H. DUNCKLEE, taken pursuant

17   to Connecticut General Statutes, Section 52-148a et

18   seq. and Section 13-26 et seq. of the Connecticut

19   Practice Book, at the law offices of Robinson & Cole,

20   Eugene O'Neill Boulevard, New London, Connecticut,

21   before Sarah J. Miner, L.S.R., a Notary Public in and

22   for the State of Connecticut, on August 30, 2005, at

23   11:30 a.m.

24

25

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

4

1                    LESTER H. DUNCKLEE,

2    having first been duly sworn by the Notary Public to

3    tell the truth, the whole truth, and nothing but the

4    truth, was examined and testified as follows:

5             (Plaintiff's Exhibit Nos. 7 and 8 marked for

6    identfication.)

7                         EXAMINATION

8    BY MR. MILNER:

9        Q. I just want to ask you a few brief questions

10   about your background.

11           Are you a high school graduate?

12       A. Yes.

13       Q. Are you a college graduate?

14       A. No.

15       Q. How old are you now?

16       A. 64.

17       Q. And as of September 30th, '02 you were a

18   state marshal?

19       A. Yes.

20       Q. Did you notify the CChief Court's

21   Administrator's Office as required to become a state

22   marshal when they changed over from sheriffs to

23   marshal's?

24           MS. TOBIN:  Objection to the form.

25           THE WITNESS:  Yes.

Page 4

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

5

1    BY MR. MILNER:

2        Q. Do you have any documentation that you did

3    complete that notification?

4        A. No.

5        Q. Was there any documentation generated at the

6    time you sent that notification?

7        A. No.

8        Q. So how did you make that notification?

9        A. It was a form that we just filled out.

10       Q. So then there is documentation?

11       A. I don't know.

12       Q. Well, you just answered the question, no,

13   there was no documentation, then you said there was a

14   form they filled out.  So there is a form in existence

15   that you notified the Chief Court's Administrator's

16   Office?

17           MS. TOBIN:  Objection.

18           THE WITNESS:  I would imagine so.

19   BY MR. MILNER:

20       Q. Do you know where that form was stored?

21       A. No.

22       Q. Was it sent to the Chief Court's

23   Administrator's Office?

24       A. I don't recall.

25       Q. When you went through training as a

Page 5

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

11

1    instruction on constitutional law?

2        A. No, I don't recall that.

3        Q. Did you get any instruction or training

4    concerning the civil capias?

5        A. Yes.

6        Q. Can you explain to me what that was, what the

7    training surrounding a civil capias was?

8        A. The classes were on-the-job under the direct

9    supervision of qualified instructors.

10       Q. And were those qualified instructors also

11   state marshals?

12       A. Deputy sheriffs.

13       Q. So this was prior to the State Marshal

14   Program?

15       A. Yes.

16       Q. Now, this on-the-job training, did you

17   actually serve pending capiases?

18       A. Yes.

19       Q. With the accompaniment of an instructor?

20       A. I can't answer that, I did not serve during

21   the training capiases.  I was with certified

22   instructors who did the actual serving.

23       Q. Okay.

24       A. And I observed the process and was taught on

25   each one how it was done, and why it was done.

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

12

1        Q. And that was on-the-job?

2        A. Yes.

3        Q. Okay.  At any time in your training or

4    classes were you taught anything about a criminal

5    arrest warrant?

6        A. No.

7        Q. Has there been any recertification of state

8    marshal's since the inception of the State Marshal

9    Program in the State of Connecticut?

10       A. For capias team members there has been

11   recertification.

12       Q. So there is a specific group of capias team

13   members?

14       A. Yes.

15       Q. And what are you required to do to become a

16   member of that capias team?

17       A. The items that are listed, I believe in

18   Question 17, are all retaught and recertified with

19   written tests.

20       Q. Have you been recertified with a written

21   test?

22       A. Yes.

23       Q. In my previous questions I asked, have you

24   had any written exams to become a state marshal, and

25   you said, no.  So now are you changing your answer to

Page 12

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

16

1          MS. TOBIN:  In effect at that time, 2002?

2          MR. MILNER:   Correct.

3          MS. TOBIN:  Are you asking him about capias

4    forms in effect today?

5          MR. MILNER:   No.

6    BY MR. MILNER:

7          Q. I would like to also show you a copy of

8    Schneider's Exhibit 3, as a police report from the

9    Town of Stonington.  The paragraph at the bottom of

10   the page that summarizes what happened starting with

11   on 9/30/02, it says that the, it was an arrest warrant

12   issued for Steve Milner on a failure to appear charge.

13   To your knowledge was an arrest warrant issued?

14         A. Yes, capias is a valid arrest warrant.

15         Q. Where do you get that information?

16         A. In our past training.

17         Q. Can you tell me what instructor trained you

18   that a capias is an arrest warrant?

19         A. Too much time has gone by, I don't recall.

20         Q. Well, you did testify that within the last

21   year you have had recertification in the capias team,

22   correct?

23         A. Yes.

24         Q. So you can't recall in the past year whether

25   or not you were trained about a capias, and whether or

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

18

1    BY MR. MILNER:

2         Q. I asked if he would like to review it.  I

3    don't have an answer.

4         A. I did review it.

5         Q. Thank you.  Isn't it true that you used the

6    words "arrest warrant" in order to obtain access to my

7    house?

8              MS. TOBIN:  Objection to the form.

9              MR. MILNER:  Can he answer the question?

10             MS. TOBIN:  Yes.

11             THE WITNESS:  Yes, capias is a valid arrest

12   warrant.

13   BY MR. MILNER:

14        Q. Let me show you the Connecticut Statute

15   Section 54-2A, as Plaintiff's Exhibit 5, of the

16   Schneider deposition.  Does the statute have anything

17   to say that a capias is a valid arrest warrant?

18             MR. KARSTEN:  Object to the form.

19             MS. TOBIN:  Object to the form.

20             THE WITNESS:  Never seen this document

21   before, I have no comment.

22   BY MR. MILNER:

23        Q. You have never read the arrest statute of

24   54-2a?

25        A. I have not seen this form before.

Page 18

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

24

1        Q. Who actually handed you the capias to be

2    served?

3        A. Attorney Gary Traystman.

4        Q. Did he hand it to you personally?

5        A. Yes.

6        Q. Did he have any conversation with you when he

7    handed it to you?

8        A. I think he said, "This is going to be a

9    difficult one".

10       Q. Did he elaborate on his statement that it was

11   a difficult one?

12       A. Not that I recall.

13       Q. Was your service of the capias to me on

14   September 30th, '02 any more difficult than any other

15   capias you have served?

16        MS. TOBIN:  Objection to the form.  You can

17   answer.

18        THE WITNESS:  I would say that the capias was

19   fairly typical.

20   BY MR. MILNER:

21       Q. In serving capiases do you typically run into

22   resistance by the person been served?

23        MS. TOBIN:  Objection to the form.

24        MR. KARSTEN:  Objection to the form.

25        THE WITNESS:  I don't do the capiases alone,

Page 24

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

0

25

1    usually I have a sworn officer or two with me in the

2    service of capiases.  We never do these things alone.

3    BY MR. MILNER:

4        Q. But my question was --

5            MS. TOBIN:  Are you finish with your answer?

6            THE WITNESS:  Yes.

7    BY MR. MILNER:

8        Q. My question was, do you typically run into

9    resistance by the person being served?

10           MS. TOBIN:  Object to the form.  Go ahead.

11           THE WITNESS:  Typically run into a problem?

12   No, I don't typically run into a problem.

13   BY MR. MILNER:

14       Q. So then by Mr. Traystman's statement of this

15   being difficult, did you anticipate some kind of

16   resistance?

17       A. As I stated prior, I always go with an

18   officer for my own protection or two officers for my

19   own protection.

20       Q. That wasn't my question.  My question is, by

21   Mr. Traystman stating that this was going to be a

22   difficult one, did you anticipate there was going to

23   be resistance?

24       A. No, no more than usual.

25       Q. Can you tell me what else was said in that

Page 25

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

26

1    conversation with Mr. Traystman?

2        A. As I said, prior answer is the same, that I

3    don't recall any conversation with him about you.  He

4    just handed me, here is a capias.  I have done

5    hundreds of these.

6        Q. Correct.  But, just so I am clear, there was

7    no other conversation between you and Mr. Traystman

8    other than he said, "This is going to be a different

9    one"; is that correct?

10        MS. TOBIN:  When he handed the capias to him?

11    BY MR. MILNER:

12        Q. When he handed the capias to him.

13        A. His comment was, "This might be a difficult

14    one".

15        Q. You still didn't answer my question.  My

16    question was, was there any other conversation?

17        MS. TOBIN:  At that time?

18    BY MR. MILNER:

19        Q. Just requires a yes or no answer.

20        A. I don't recall.

21        Q. Were you aware at the time that you picked up

22    the capias from Mr. Traystman of my history with Mr.

23    Traystman?

24        A. Never heard of you before.

25        Q. So I guess your answer is, no, you were not

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

27

1    aware of my history with Mr. Traystman?

2        A. Not aware of any histories with you at all.

3        Q. You have just stated that you typically go

4    and get assistance from police officers to serve these

5    capiases.  On the night of September 30th '02, where

6    did you go to get your assistance?

7        A. In the town that I was working in, which is

8    Stonington.

9        Q. So what building did you go to?

10       A. The Stonington Police Department.

11       Q. Who did you speak to there?

12       A. Sergeant Johnson.

13       Q. Do you know Sergeant Johnson's first name?

14       A. I believe it is Eric Johnson.

15       Q. What did you ask him to do for you?

16       A. I asked him if he could provide me with an

17   officer to accompany me in the service of a capias.

18       Q. And is it correct that he provided you with

19   two officers?

20       A. Yes.

21       Q. Did you request two officers?

22       A. No.

23       Q. Is it correct that the two officers that

24   accompanied you were Mr. Schneider, and Mr. Peckham?

25       A. Yes.

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

30

1   of my truck.

2        Q. Is that your answer, or is that just a guess?

3        A. I don't recall.

4        MS. TOBIN:  Instruct the witness not to

5   guess.  Mr. Milner doesn't want you to guess, he wants

6   you to tell him what you recall.

7        THE WITNESS:  I don't recall.

8        MS. TOBIN:  For this, and all other

9   questions.

10       THE WITNESS:  Thank you.

11  BY MR. MILNER:

12       Q. All right.  Let's turn our attention to the

13  events of September 30th, '02.

14       You came to my house on September 30th, '02,

15  correct?

16       A. Yes.

17       Q. You came there approximately at 9:30 at

18  night?

19       A. Approximately.

20       Q. Do you recall the exact time?

21       A. No, sir, I don't.

22       Q. Can you tell me why you decided to serve that

23  capias at 9:30 at night?

24       A. That time of night generally the person you

25  are looking for is at their residence.

Page 30

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

31

1       Q. But you are allowed by law to serve it at any

2    time, correct?

3       A. Correct.

4       Q. Did you serve it at 9:30 at night just to

5    make it impossible for me to post my bond?

6          MS. TOBIN:  Object to the form.  You can

7    answer.

8          THE WITNESS:  That decision didn't enter into

9    it at all.  It was -- the easiest time to pick someone

10   up is generally from 6:00 to 10:00 o'clock, somewhere

11   in that time frame, they are home.

12   BY MR. MILNER:

13      Q. But you could have picked me up at 6:00 in

14   the morning, correct?

15      A. I don't know your work schedule.  It is the

16   best time for me to pick someone up is between six and

17   10.

18      Q. I am going to show you the capias form again

19   Plaintiff's Exhibit 2 from the Schneider deposition,

20   and it says at the end, in part it says, "By the

21   authority State of Connecticut to command you to take

22   the person named above to bring said person before

23   this court without due delay."

24          MS. TOBIN:  Without undue delay.

25   BY MR. MILNER:

Page 31

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

0

32

1      Q. Yes, undue delay.  Is that what it says
2   there?
3      A. That sentence, without undue delay and if the
4   court is not in session.
5      Q. I didn't ask you that question, I asked if it
6   says you were to bring the person to court with undue
7   delay?
8      A. That is one of the options.
9      Q. Isn't the purpose of a capias to bring the
10  person to court?
11      MS. TOBIN:  Objection to the form.  You can
12  answer.
13  BY MR. MILNER:
14      Q. She said you could answer the question.
15      A. Yes, it is, to get them to court is one of
16  the options, to court or to the community correctional
17  center, depending on the availability of the person.
18      Q. But had you picked me up at 4:00 in the
19  morning you could have brought me to court that day,
20  correct?
21      MS. TOBIN:  Objection to form.
22      MR. KARSTEN:  Objection to form.
23      MS. TOBIN:  You can answer.
24      THE WITNESS:  I could have brought you to
25  court -- I could have picked you up at four, and

Page 32

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

⬚

33

1    brought you to court in the morning when court was in

2    session, yes.

3    BY MR. MILNER:

4        Q. And you would agree that most people are home

5    at 4:00 in the morning?

6            MS. TOBIN:  Objection to the form.

7            THE WITNESS:  Yes.

8    BY MR. MILNER:

9        Q. So picking me up at a different time than

10   9:30 at night was an option, correct?

11       A. Yes.

12       Q. So on September 30th, '02, you came to the

13   front door of my house, correct?

14       A. Correct.

15       Q. And did you knock on the door?

16       A. Yes.

17       Q. Do you recall how many times you knocked?

18       A. No.

19       Q. Did you use your hand to knock on the door,

20   did you use a door knocker?

21       A. I believe I used a door knocker.

22       Q. Did the exterior lights on the house come on?

23       A. I don't recall.

24       Q. Was it dark that evening at 9:30 at night?

25       A. Yes.

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

34

1      Q. But you were able to see the door knocker at
2  that hour?
3      A. I don't recall.  I told you I believe I used
4  a door knocker.
5      Q. Well, I am going to take that as a, yes.
6          So how did you find the door knocker in the
7  dark?
8          MS. TOBIN:  Objection to the form.  He said
9  he believes he used one.
10  BY MR. MILNER:
11      Q. Did you feel around with your hand, did you
12  use a flashlight?
13      A. You know what, I don't recall.
14      Q. Did you announce who you were prior to the
15  door opening?
16      A. I don't recall.
17      Q. I would like you to take a look at your
18  interrogatory Question Number 9.  It says, "Did you
19  announce who you were the instant the door opened?"
20  The answer was, "I identified myself when the door was
21  opened."  Is that what it says there, Question Number
22  9?
23          MS. TOBIN:  Is that your answer?
24          THE WITNESS:  Yes.
25  BY MR. MILNER:

Page 34

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

35

1      Q. So after the knock the door opened, correct?

2      A. Okay, yes.

3      Q. And what was the first thing that you did?

4      A. Announced who I was, and what the purpose of

5      the visit there was.

6      Q. Does you place your foot inside the door on

7      the floor?

8      A. Put my foot in such a manner that the door

9      couldn't be slammed on me, so that I could communicate

10     with the person opening that door.

11     Q. Was the door attempted to be slammed on you?

12     A. The door was touching my foot.  I don't

13     recall if it was, I don't believe it tried to be

14     slammed on my foot, no.

15     Q. Would you say your foot was inside the door

16     on the floor?

17     A. No, my toe.

18     Q. It was past the threshold, though?

19     A. My toe, it was.

20     Q. Would you categorize that as being inside the

21     house?

22          MR. KARSTEN:  Object to the form.

23          MS. TOBIN:  Object to the form.

24          THE WITNESS:  No.

25     BY MR. MILNER:

Page 35

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

36

1      Q. At that point did you have consent to be in

2   the house?

3          MS. TOBIN:  Object to the form.

4          THE WITNESS:  Explain to -- I explained to

5   the person that opened the door that the purpose is

6   that I had a capias arrest warrant for Steve Milner.

7   BY MR. MILNER:

8      Q. That evening did you actually use the word

9   "capias" when you explained to that person you talked

10  to?

11     A. I don't recall, usually we just say an arrest

12  warrant.

13     Q. So is your answer that you used the words

14  "arrest warrant" that evening?

15     A. I don't recall, I use it so frequently, they

16  are both back and forth with capias, arrest warrant.

17     Q. What was the answer that you got to your

18  statement that you had a capias arrest warrant or an

19  arrest warrant?

20     A. That Steve Milner was not here.

21     Q. Did this person say anything else?

22     A. I don't recall.

23     Q. At the moment that you put your foot in the

24  door, I may have asked this question, I apologize, I

25  don't remember his answer, at the moment that you put

Page 36

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

40

1    answer if you can.

2    BY MR. MILNER:

3        Q. That is a yes or no answer.

4            MR. KARSTEN:  Object to the form.

5            THE WITNESS:  What did he say?

6            MS. TOBIN:  He objected to the form.

7            THE WITNESS:  At that time I would say, no,

8    we hadn't gotten that far in our dialogue.

9    BY MR. MILNER:

10       Q. Did you use any force in opening the door?

11           MR. KARSTEN:  Objection to the form.

12   Presupposes that he opened the door.

13           THE WITNESS:  The door was already open.

14   BY MR. MILNER:

15       Q. Did you use any force to open the door wider

16   than it was already open?

17           MS. TOBIN:  Object to the form.

18           THE WITNESS:  I am a pretty strong person, I

19   just opened the door.  It was no force, no leaning

20   again the door or doing anything, just opened the

21   door.

22   BY MR. MILNER:

23       Q. Was the person on the other side of the door

24   standing at the door at the time you opened the door

25   or you continued to open the door?

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

41

1         MS. TOBIN:  Objection.

2         MR. KARSTEN:  Same objection.

3         THE WITNESS:  I couldn't see the person, it

4    would just be speculation.

5    BY MR. MILNER:

6         Q. You testified earlier that you had

7    conversation with the person behind the door?

8         A. Right.

9         Q. Did you see the person at that point?

10        A. No.

11        Q. Did you ever push this paper through the

12   opened door, the capias paper through the opened door?

13        A. Well, there was a pretty good gap, and I

14   could have passed it and showed her what I had, and

15   shown an identification to her.

16        Q. Do you recall the tone of voice you used in

17   showing the capias paper?

18        A. I guess it was pretty calm, because I

19   generally am a really calm person.

20        Q. You didn't raise your voice?

21        MS. TOBIN:  Let him finish his answer.

22        MR. MILNER:  I didn't realize he wasn't done.

23        THE WITNESS:  Generally my voice is very

24   calm.  I do speak in a firm manner, but not in a loud

25   manner, and not in an obnoxious manner.  It would have

Page 41

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

42

1    been said in a professional manner, also.

2    BY MR. MILNER:

3        Q.    I would like you to take a look at this

4    document.  I would like to enter this, also.

5            MS. TOBIN:  Are you going to mark that as an

6    exhibit?

7            MR. MILNER:    Yes.  I would like to mark

8    this exhibit as a transcript of the U.S. District

9    Court hearing on September 15th, 2003.

10            (Plaintiff's Exhibit No. 10 marked for

11    identification.)

12    BY MR. MILNER:

13        Q. This is transcript of a hearing that we had

14    in the present case before Judge Underhill on

15    September 15th, 2003.  Were you present at that

16    hearing?

17        A. No.

18        Q. Your counsel told the judge that in speaking

19    about whether or not there was a dispute it says in

20    part that there is no dispute that Marshal Duncklee

21    put his foot in the door, and prevented her from

22    closing it is certainly different from coming to

23    someone's house with an ax.

24            And they were referring to a case where I

25    believe axes were used to break down a door.  And then

Page 42

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

43

1    the court says, "Well, he didn't have to use an ax

2    because she opened the door, and there is no dispute,

3    we have to assume the truth of the allegations in my

4    opinion."  And he is referring to the allegations in

5    the complaint.  And then your attorney answered, "I

6    agree.  I am not saying there was no force."  So would

7    you agree with that statement, that there was force?

8             MS. TOBIN:  Object to the form.

9             MR. KARSTEN:  Object to the form.

10            THE WITNESS:  I don't know what you would

11   consider force.  Some people going in a door is

12   forceful, to other people it would be not forceful.  I

13   don't know what constitutes, as I said before, there

14   was no pushing the door in, there was no leaning back,

15   or anything like that, it was just the door went in.

16   BY MR. MILNER:

17       Q. Once you were inside the house, what did you

18   do next?

19       A. I spoke with the lady again, asked where you

20   were.  She said you weren't here.  I asked if she

21   would show me the garage, which she did.

22       Q. During that time did you raise your voice at

23   all?

24       A. I would be firm, but my voice is not one to

25   rise.

Page 43

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

44

1     Q. Can you explain to me what the difference is

2    between your firm voice, and your risen voice?

3     A. The way we are talking right now is not a

4    firm voice.  A firm voice would be an authority figure

5    voice.

6     Q. So would a firm voice in your opinion, in

7    your instance be raised?

8       MS. TOBIN:  Object to the form.

9       MR. KARSTEN:  Object to the form.

10      THE WITNESS:  As I said, my demure is not

11   to be yelling or hollering, or anything like that.  It

12   would be a firm voice, and it would be at an even

13   level.

14  BY MR. MILNER:

15    Q. So is your firm voice louder than we are

16   talking today?

17    A. Right now, yes.

18    Q. When you were shown the garage, what did you

19   do?

20    A. Looked in the garage.

21    Q. How did you get to the garage?

22    A. She showed me where the garage was.

23    Q. Do you recall what rooms you walked into?

24    A. No, I don't.  I don't recall the layout of

25  the house either.

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

45

1        Q. Do you recall what room you entered from the

2   front door?

3        A. No.

4        Q. Do you recall what was in that room that you

5   entered?

6        A. Not at all.

7        Q. Do you recall seeing anyone else in the

8   house?

9            MS. TOBIN:  At what time?

10           MR. MILNER:  Well, you want a date?

11           MS. TOBIN:  When he entered the house or

12  later?

13  BY MR. MILNER:

14       Q. Yes, at any time did you see anyone else in

15  the house prior to seeing me in the house?

16       A. The woman that was there that I spoke with.

17       Q. Anyone else?

18       A. There was a child, one child that I saw at

19  one time during that.

20       Q. A boy or a girl?

21       A. I believe it was a boy.

22       Q. Do you recall if the boy said anything?

23       A. I don't recall what time the boy was there,

24  what time the boy appeared.

25       Q. No, my question was whether or not he said

Page 45

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

46

1    anything?

2        A. I am trying to think.  I think he did.

3        Q. Do you recall what he said?

4        A. He was indicating that you were there, but I

5    don't recall how he said it.

6        Q. After you saw the garage where did you go?

7        A. I believe I asked the lady where you were,

8    and then I headed upstairs to see if you were

9    upstairs, at which time I got a call that you

10   apparently came out from somewhere, that you were

11   there.

12       Q. Did you make it to the second floor?

13       A. Yes.

14       Q. Did you go in a bedroom on the second floor?

15       A. Boy, for a yes or no answer I would say

16   probably went to the door and looked into the bedroom

17   or more than one bedroom, and that is about the time I

18   got a call to come downstairs, you were there.

19       Q. Who called you to come downstairs?

20       A. I believe it was one of the police officers.

21       Q. Do you recall which one?

22       A. No, sir.

23       Q. So at what point did I appear?

24       A. When I was upstairs, so I don't know where

25   you came from or where you appeared from.

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

47

1     Q. I guess my question is, when was the first

2  time you saw me, where were you when you first saw me?

3     A. When I came down the stairs, to the best of

4  my recollection.

5     Q. Were you still on the stairs?

6     A. I don't recall stairs.  I don't recall that.

7     Q. What happened next?

8     A. I believe I informed you that I had an arrest

9  warrant for you, capias, for failure to appear.

10     Q. Did you use the word "capias" or did you use

11  the words "arrest warrant"?

12     A. I use them so frequently, and intermingle

13  them, I can't be sure which way.

14     Q. Did you hand me a piece of paper?

15     A. I gave you a copy of the capias.

16     Q. What did I say?

17     A. I remember you saying, "Could you give me a

18  few minutes, could I use the phone, can I call my

19  attorney?"  And you went over to your desk, and you

20  made your phone calls.

21     Q. Are you finished?

22     A. Yes.

23     Q. During the time we are just talking about,

24  from the time you came into the house until the time

25  you met me, did you ever yell, "Steven, Steven,

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

48

1    Steven" in the house?

2         A. I don't know about yell, it would be asking

3    for you, not just roaming through a house.

4         Q. Did you ever say, "We are going room to room

5    until we find him"?

6         A. I don't recall that.

7         Q. Do you ever recall at the time you handed the

8    paper to me, do you recall I said, "This is not a

9    warrant, this is a capias"?

10        A. No.

11        Q. Do you recall yelling to one of the police

12   officers, "Cuff him, cuff him, cuff him"?

13        A. No, not at all, I don't cuff in front of

14   children if there is a child there.  I take the risk

15   of in order to preserve the child's integrity during

16   this, I do it outside away from the family.

17        Q. Was the child in the room that you handed me

18   the paper?

19        A. I don't recall.  As I said, sir, I really

20   don't recall how your house is laid out.

21        Q. I didn't ask about the layout, I asked

22   whether or not the child was in the room when you

23   handed me the capias?

24        A. That I am not sure.

25        Q. When I said I wanted to call my lawyer, did

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

49

1    you say, "We don't have time for that"?

2        A. Probably not, because I usually afford when I

3    do a capias in order to keep things deescalated the

4    right to use the phone or make arrangements or make

5    calls for bond money for help.

6        Q. Why would you allow someone to call for bond

7    money?

8        A. It is a courtesy I always extend which fist

9    keeps it deescalated.  Generally I say that to

10   everyone, just to keep things from escalating.

11       Q. Did I make an attempt to call for bond money?

12       A. I didn't listen to your conversation.

13       Q. How far away were you standing from me when I

14   was on the telephone?

15       A. I can't hear what is going on with the

16   conversations.

17       Q. I guess I didn't ask you that, I asked you

18   how far you were standing from me when I was talking

19   on the phone?

20       A. I don't recall.

21       Q. What room were you in when I made the phone

22   call?

23       A. I believe we had gone to an area where your

24   desk was.

25       Q. Was there a telephone in that room?

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

50

1       A. I don't recall, but I thought you made the
2    call from that desk.
3       Q. Do you recall what else happened in that room
4    at that time?
5       A. No, you would have to be more specific.
6       Q. Do you recall me taking out a checkbook, and
7    signing checks?
8       A. Yes, I do.
9       Q. Do you recall the police officer standing in
10   the room?
11      A. No, I don't.  They stay in close proximity to
12   me, and all the departments, in case something -- I
13   get attacked, because at that time I violated the
14   rules that we use on cuffing to extend you the
15   courtesy to do what you requested, and not to cuff you
16   in front of the child.
17      Q. That was your earlier testimony, you don't
18   normally cuff in front of children?
19      A. Yes.
20      Q. Was that a courtesy you extend to everyone?
21      A. Yes.  If there are children present and the
22   demure of the person is such that I don't feel
23   threatened.
24      Q. Did you feel threatened in any way that
25   evening?

DUNCKLEE.txt

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

[]

63

1        A. Not at that moment, no.

2        Q. Did you hand the paper through the door

3    opening, do you recall doing that?

4        A. I believe I did.

5        Q. And someone took it?

6        A. Yes.

7        Q. And at that moment you were explaining what

8    your reason for being there was; is that correct?

9        A. Yes.

10       Q. Did the officers say anything during that

11   interchange?

12       A. No, they wouldn't make any comment.

13       Q. Then you sort of gestured to the opening with

14   your right arm of the door?

15       A. Yes.

16       Q. Did you encounter resistance when you did

17   that; do you recall?

18       A. Well, not very much.

19       Q. I don't want you to guess.

20       A. At this stage, you know what, I am not sure.

21       Q. You can't say one way or another?

22       A. No.

23       Q. Was there anything verbal in this discussion

24   that you construed as resistance to your entering into

25   the house?

DUNCKLEE.txt


SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503


0

71

1          C E R T I F I C A T E
2          - - - - - - - - - -

3          I hereby certify that I am a Notary Public, in

4     and for the State of Connecticut, duly commissioned

5     and qualified to administer oaths.

6          I further certify that the deponent named in the

7     foregoing deposition was by me duly sworn and

8     thereupon testified as appears in the foregoing

9     deposition; that said deposition was taken by me

10    stenographically in the presence of counsel and

11    reduced to typewriting under my direction, and the

12    foregoing is a true and accurate transcript of the

13    testimony.

14         I further certify that I am neither of counsel

15    nor related to either of the parties to said suit, nor

16    of either counsel in said suit, nor am I interested in

17    the outcome of said cause.

18         Witness my hand and seal as Notary Public the

19    17th day of September, 2005.

20

21

22                              _____

                                        Notary Public

23

24    CSR NO. 00223
      My Commission Expires:
25    November 31, 2007
                         Page 71