# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * * * * * *
                               *
STEVEN MILNER, AND HEIDI CANNON,*
        Plaintiffs,            *
                               * CIVIL ACTION NO.
VS.                            * 3:02cv01929(SRU)
                               *
LESTER DUNCKLEE, ET AL.,       * AUGUST 4, 2005
        Defendants.            *
                               *
* * * * * * * * * * * * * * * *
```

# COPY

## DEPOSITION OF STEVEN MILNER

Taken on behalf of the Defendants in the above-entitled

cause, before Patricia Tyszka, Registered Merit Reporter,

Notary Public, in and for the State of Connecticut, on

Thursday, August 4, 2005, at 10:34 a.m., at the offices of

Karsten & Dorman, 29 South Main Street, West Hartford,

pursuant to the Federal Rules of Civil Procedure.

13

```
 1      A      Yes.

 2      Q      How many?

 3      A      Three.

 4      Q      What are their names?

 5      A      Eric.  Peter.  Patrick.

 6      Q      How old are they?

 7      A      The first one is 27, the second one is 25, and

 8   the last one is 21.

 9      Q      When did you last see your ex-wife?

10      A      Over 10 years ago.

11      Q      Did you speak with her on the phone more recently

12   than that or have any other communication with her?

13      A      No.  No, I haven't communicated with her in over

14   10 years.

15      Q      When did that marriage end in divorce?

16      A      '92.

17      Q      I take it there wasn't a lot of interaction with

18   your ex-wife after you got married to Ms. Cannon?  None?

19      A      There was no interaction --

20      Q      Right.  Was there any interaction between the

21   families once you got together with Ms. Cannon?

22      A      When you say "between the families," no.

23      Q      First your ex-wife and then your three sons.

24      A      Well, there was interaction between Ms. Cannon

25   and my sons.
```

24

```
 1   payments to your ex-wife?
 2        A     No.
 3        Q     When did that conclude?
 4        A     (No response.)
 5        Q     How old was the youngest kid?
 6        A     Well, that was the subject of this capias.  So
 7   '02, I guess.
 8        Q     Have you filed tax returns in the last three
 9   years?
10        A     Yes.
11        Q     Do you have copies of them?
12        A     Yes.
13        Q     You said something about the child support was
14   the subject of the capias involved in this case.  Tell me
15   about the child support obligations that you had to your
16   ex-wife that led to the capias being issued in this case.
17        A     Well, I was trying to modify the child support --
18        Q     Let's go back before that.  What was the child
19   support obligation that you were required to pay after
20   your divorce in 1992?
21        A     You mean the amount?
22        Q     Approximately.
23        A     Again, I'm guessing.  $250 a week.
24        Q     Total or per child?
25        A     No; that was total.
```

1    Q    Was there an alimony obligation in addition to

2    that?

3    A    No.

4    Q    All right.  You said that at some point you were

5    trying to modify that?

6    A    Yes.

7    Q    At what point was that that you were trying to

8    modify that?

9    A    That would have been 1995.  Either '94 or '95.

10   Q    What were you doing to try to modify it?

11   A    Well, I had filed motions in court.

12   Q    Were you successful in accomplishing a

13   modification?

14   A    No.

15   Q    Did there come a time when you stopped paying the

16   child support --

17   A    Yes.

18   Q    -- that had been ordered by the Court?

19   A    Yes.

20   Q    When did you stop making those payments?

21   A    Right around that same time:  '94, '95.  Whenever

22   these motions were filed.

23   Q    Did you make any payments to an escrow account or

24   any sort of other account to set aside the money that the

25   Court had ordered that you pay so that it would be

```
 1   available?

 2       A    No.

 3       Q    You just stopped paying?

 4       A    I was unable to pay.

 5       Q    Okay.  And then --

 6       A    I didn't maliciously stop paying.

 7       Q    Why was it that you were unable to pay?

 8       A    Because I had -- in the divorce proceedings they

 9   had taken all my assets.  Virtually put me out of

10   business.

11       Q    I may have asked you this before, but were you

12   represented by counsel in the first divorce?

13       A    At some points, yes.  Some points, no.

14       Q    Same lawyer or different lawyers?

15       A    Different lawyers.

16       Q    Okay.  At it's highest level, what was the amount

17   of the arrearage of the child support that you were unable

18   to pay?

19       A    I have no idea.

20       Q    Approximately?

21       A    No.  All I know is what they claim -- what the

22   other side claimed when the capias was served.

23       Q    What were they claiming at that time?

24       A    $40,000.

25       Q    You think that that's an unrealistic number?
```

```
 1        A    Yes.

 2        Q    What would you think a realistic number would

 3   have been?

 4        A    I really had no idea.

 5        Q    Did you ultimately make payment of an arrearage

 6   of that child support obligation?

 7        A    Yes.  We came to an agreement.

 8        Q    What amount did you actually pay?

 9        A    Again, it's an approximate because -- it was

10   $30,000.  But it may have been $32,000.  I don't remember.

11        Q    Did that end your child support obligation or did

12   it continue on after that?

13        A    Yes.  Ended.

14        Q    Am I correct in assuming that before there was an

15   application for a capias for your being taken into

16   custody, there were requests and letters and threats and

17   all that sort of thing from your ex-wife with regard to

18   the nonpayment of child support?

19        A    No.  There was none of that.

20        Q    There was none of that?

21        A    No.

22        Q    Were there any communications to you whatsoever

23   from your ex-wife or from her counsel in connection with

24   the nonpayment of child support?

25        A    At any time or --
```

1    before the capias was issued?

2         A    No.

3         Q    What is your understanding of how the capias came

4    to be issued in 1995?

5         A    In 1995, I didn't know there was a capias issued.

6         Q    That's not my question.

7         A    Okay.

8         Q    Now, as you sit here now --

9         A    Yes.

10        Q    -- what is your understanding of how that came to

11   be issued?

12        A    I believe it was issued for two reasons:  For

13   nonpayment and also for not showing up in court.

14        Q    As you understand it, was it issued for one

15   failure to appear in court or for more than one?  In

16   addition to the nonpayment.

17        A    I believe it was only one failure to not appear.

18        Q    And it's your testimony that before that capias

19   was issued you had no idea that your wife was applying for

20   it?

21        A    No.  I had no idea.

22        Q    Did you know about the court appearance that you

23   were supposed to show up at and didn't?

24        A    Yes.

25        Q    What was the reason that you didn't appear at

30

1    that court appearance?

2        A    I knew I couldn't pay the money, the Court would

3    give me no relief, the judge would not recuse himself, so

4    I felt I had no option.

5        Q    This was a judge that you had tangled with

6    before, I take it?

7        A    Yes.

8        Q    Judge Teller?

9        A    Yes.

10       Q    Had he already denied your petitions for

11   modification?

12       A    I don't really recall whether he actually denied

13   it or whether we were still in the throes of arguing it.

14       Q    Were you represented by counsel at the time that

15   you were seeking modification of the child support

16   obligation?

17       A    No.

18       Q    After you declined to appear in court on that

19   occasion, did you ever make any inquiries with the Court

20   about what the consequences of that were?

21       A    I don't fully understand your question.

22       Q    Okay.  You knew about the court appearance date,

23   correct?

24       A    Yes.

25       Q    You knew that you hadn't showed up for it,

1    correct?

2       A    Yes.

3       Q    Did you ever try to find out from anybody, the

4    Court or otherwise, what might happen to you as a result

5    of that failure to appear?

6       A    No.

7       Q    Did you know at any time prior to September 30th,

8    2002, that a capias had been issued for your arrest?

9       A    I didn't know definitely, but I assumed it may

10   have been.

11      Q    Why did you assume that that might have happened?

12      A    Well, that's the procedure.

13      Q    Did you know that?

14      A    Yes.

15      Q    When did you come to know that?

16      A    I have no idea.  I don't know how to answer that

17   question.

18      Q    Well, when and how did you ever come to

19   understand that there might be a difference between a

20   capias and an arrest warrant?

21      A    Well, I knew at the time that they served the

22   capias that it was a civil matter, and I assumed at that

23   time that they couldn't -- come in -- well, I think I knew

24   at that point that they couldn't come in my house without

25   an arrest warrant.

32

```
1    Q    How did you know that?

2    A    I don't know how I knew that.  I mean --

3    Q    Had you researched it?

4    A    Probably, yeah.

5    Q    Assuming that you researched it, how did you go

6  about doing that?  Did you go to a law library --

7    A    Yes.

8    Q    When did you do that?

9    A    Well -- can we back up a little bit?

10   Q    Sure.

11   A    You asked me about being a plaintiff in any other

12 lawsuit, and I had forgotten one.

13   Q    Okay.

14   A    Sometime after this incident with Judge Teller,

15 failure -- he failed to recuse himself so -- and at the

16 time I had an attorney in -- when I had an attorney,

17 excuse me, when I had an attorney in my divorce

18 proceedings, there were a couple of other judges that did

19 things that were, in his mind, in my attorney's mind, that

20 were unconstitutional.

21   Q    Who was the attorney?

22   A    Richard Dixon.

23   Q    Where is he at?

24   A    He's in New London.

25   Q    So you had discussions with him about that?
```

1    A    Yes.   And at that time I didn't have money to

2    appeal all of these decisions that were felt to be

3    unconstitutional, and the trouble I was having with Judge

4    Teller, I was a plaintiff in a federal lawsuit where I

5    sued five superior court judges.

6    Q    Five state judges?

7    A    Yes.

8    Q    Were you represented by an attorney in that?

9    A    No.   So at that time is probably when I

10   researched the capias, arrest warrant.   So I'm thinking

11   that -- you're bringing these thoughts up now as to how

12   I -- to answer your question how I knew about this capias

13   arrest warrant thing, and you're refreshing my memory by

14   asking me these questions.   And I believe at that time,

15   probably '96ish or so, that I would have known that.

16   Q    So can I fairly assume that you were researching

17   the consequences of the failure to appear, among other

18   things, and learned of the capias being one possible means

19   of pursuing that?

20   A    I guess that's a fair assumption.   Yeah.

21   Q    Do you remember who the other judges were?   I

22   assume Teller was one of them?

23   A    No, Teller was not one of them.

24   Q    Maybe two of them.   Who were the other four; do

25   you remember?

1    A    Leuba, Mihalakos, Hendel, Teller, and the old

2    gink that's still down there.

3    Q    Hendel?

4    A    No.

5    Q    Hurley?

6    A    Hurley.

7    Q    I'm sorry, I missed one.  Teller, Leuba,

8    Mihalakos, Hurley?

9    A    Teller, Mihalakos, Leuba, Hurley.

10         **MS. TOBIN:**  Hendel.

11   **BY MR. KARSTEN:**

12   Q    I didn't think Hendel was one of them.

13   A    Hendel, yes.

14   Q    It was Hendel?

15   A    Yes.

16   Q    Am I correct in understanding that you had legal

17   proceedings of some sort in front of each of these five

18   judges at some point?

19   A    Yes.

20   Q    Were they all family matters?

21   A    Yes.  And I fully understood that by suing these

22   judges they have absolute immunity.  However, the suit

23   accomplished what I wanted it to accomplish.

24   Q    What was that that you wanted to accomplish?

25   A    That they were named as a defendant in a lawsuit.

35

1    They had to recuse themselves.

2        Q    I take it that at some point the lawsuit was

3    dismissed; is that right?

4        A    Yes.

5        Q    Were there any proceedings against you after

6    that, in the way of costs or vexatious litigation or

7    anything of that sort?

8        A    No.

9        Q    So your intent in filing that lawsuit was to get

10   them to recuse themselves from your cases; is that

11   correct?

12       A    Yes.

13       Q    What was the nature of the proceedings that you

14   had been involved in before those five judges?  Family

15   matters?

16       A    Yes.

17       Q    Were these all your modifications for --

18   petitions for modification of child support?

19       A    No.  The underlying factor was that they were

20   actually cutting my visitation off because I couldn't pay.

21   They would not hear any motions to modify the visitation

22   or any motions about visitation.  It wasn't blatant, but

23   it was the underlying reason why they wouldn't.  They were

24   trying to force me to pay child support so I could see my

25   kids, which is unconstitutional.

36

1    Q    How far did the lawsuit go?  In other words, was

2    there any discovery conducted?

3    A    Again, you're asking me questions that I don't

4    have a recollection of.  But --

5    Q    Well, you said you had never been deposed before,

6    so I take it --

7    A    No.  There was no depositions.  We did -- I did

8    file interrogatories.  The state attorney general, I

9    believe, was able to defeat that.

10   Q    You had a stay ordered or something of that sort?

11   A    (No response.)

12   Q    Whatever.  It doesn't matter.

13   A    Yeah; I don't know.  I don't know how that went.

14   Q    After you succeeded in recusing these other

15   judges or having them recuse themselves, did you have --

16   A    Excuse me.  It never went that far.  The judges

17   never actually recused themselves.

18   Q    Oh, they didn't?

19   A    No.  Because I never went back to state court.  I

20   was fed up with what they were doing.

21   Q    So after your federal litigation was terminated,

22   you did not thereafter go back to state court?

23   A    No.

24   Q    Do you remember what year you filed that federal

25   lawsuit?

40

```
 1        A    Correct.

 2        Q    At the conclusion of all these other proceedings?

 3   Is that right?

 4        A    When you say "all the other proceedings," are you

 5   including the federal law?

 6        Q    No.

 7        A    No.  All the other state court proceedings, yes.

 8        Q    After the capias was issued you did not return to

 9   state court for any of those issues that you had --

10        A    No.

11        Q    -- brought to the court before; is that correct?

12        A    That's correct.

13        Q    All right.

14        A    Then I filed suit in federal court.

15        Q    Understood.

16        A    Yeah.

17        Q    Do you remember when the federal suit was

18   resolved?  What year?

19        A    Not exactly.  But I think it was probably the

20   following year which have would have been '97, because it

21   did go before the Second Circuit.

22        Q    You took it to the Second Circuit?

23        A    Yes.

24        Q    Was there a reported decision on that, that you

25   know of?
```

1    A    Not that I know of.

2    Q    Were you pro se the entire time in the federal

3    action?

4    A    Yes.

5    Q    What's the law library that you use?  Where's

6    that located?

7    A    I've used a few of them:  The New London Superior

8    Courthouse, Connecticut College, Groton Public Library.  I

9    think that's it.

10    Q    In connection with this case, have you consulted

11    with any attorneys at all, even informally?

12    A    No.

13    Q    I jogged your memory earlier about the federal

14    lawsuit and your being a plaintiff in it.  Have there been

15    any other cases that you've been involved in as a

16    plaintiff?

17    A    Well, I am a co-plaintiff in a -- just a small

18    case before the New London Superior Court right now.

19    Q    What kind of a case is that?

20    A    That was an issue of nonpayment for services,

21    construction services.

22    Q    What's the amount in issue?

23    A    Like $1800 or something.

24    Q    Is it in small-claims court?

25    A    No.  It's in -- they countersued and it's in

1   do you mean?

2       A    Well, that thought ran through my mind that they

3   can't be walking through my house without a search

4   warrant.

5       Q    Did you know whether they had a search warrant at

6   that time?

7       A    No.

8       Q    Did you know whether they actually had an arrest

9   warrant at that time?

10      A    No.

11      Q    You just assumed that they didn't because you

12  hadn't engaged in any criminal activity as you understood

13  it?

14      A    That's correct.

15      Q    So what happened then?

16      A    Well, when I heard them walking around upstairs,

17  then I walked into the foyer area and I said, "What's

18  going on?"

19      Q    You say you heard them walking around upstairs?

20      A    Excuse me.  When I heard someone walking around

21  upstairs.  I said, "What's going on?"  And when I walked

22  into the foyer, the front door was wide open.  The two

23  police officers were standing to the left of the front

24  door.  Heidi was standing to the right of the front door

25  in front of the stairway, and one of the police officers

69

```
1    to anyone else during the walk from the foyer to your

2    office?

3        A    No.

4        Q    When you got to your office, you attempted to

5    call someone; is that right?

6        A    Yes.

7        Q    Who did you attempt to call?

8        A    Richard Dixon.

9        Q    You were unsuccessful?

10       A    Correct.

11       Q    Did you call his home number or his office

12   number?

13       A    His home number.

14       Q    Was it busy?

15       A    Yes.

16       Q    What happened then?  You told the officers --

17   withdrawn.  You told somebody that the line was busy?

18       A    Yeah, I would assume I said it was busy.

19       Q    What happened then?

20       A    I was reading the -- this paper and I was also

21   reading the other paper that was attached to this.  It was

22   a -- the civil court paper.  You know, the arrearage of

23   the child support was all laid out and all that stuff.

24       Q    Okay.

25       A    So I was also reading that and Duncklee said to
```

1    me, "We are not concerned with that, we're only concerned

2    with this paper," meaning the capias.

3        Q    Did you ask him what was going to happen to you

4    that evening?

5        A    Well, then I dialed the phone again.

6        Q    Okay.

7        A    Yeah, I called again and it was busy again.

8        Q    Okay.

9        A    And it was at that point when I hung the phone up

10   that he said, you know, "You're going to have to get

11   $10,000 together," and I think he said, "come to Norwich"

12   -- it was either Norwich or New London Superior Court.   I

13   don't know.

14       Q    Okay.

15       A    And --

16       Q    Had somebody asked him what was going to happen

17   at that point?  After you weren't successful with the --

18       A    I think he offered that information.

19       Q    Okay.  Did the officers say anything to you --

20       A    No.  They were standing right behind me.  They

21   didn't say anything.

22       Q    So Duncklee told you that you were going to need

23   to get the bond together and where it was going to need to

24   be taken and that sort of thing?

25       A    Right.  Right.  At that point I took the

71

1   checkbook out of my drawer and I think I signed the check.

2   I can't remember if I wrote the check out or just signed

3   it and she was going to write it out.  I don't remember

4   that.

5       Q    Okay.  What did you understand you were going to

6   be doing for the rest of that evening at that point?

7       A    Sleeping with an unrelated male.

8       Q    Did you know where you were going to be taken?

9       A    I think Duncklee might have offered that.  Again,

10  I did ask him that in the car.

11      Q    We're not to the car yet.

12      A    Okay, but -- not sure if he offered that or not.

13      Q    Go ahead.

14      A    And then Heidi left the room, got me a pair of

15  shoes -- Duncklee did make some comment about shoes

16  without laces -- and a jacket.  The police officers -- one

17  of them, I don't know which one -- took the jacket, went

18  through all the pockets, took out some piece of candy and

19  some change.  I put my shoes on and my jacket, and all

20  five of us walked to the front door.  Heidi stood by the

21  front door.  Again, the door was still open.

22      Q    It was still open when you walked back to it?

23      A    Yeah.  No one had shut the door.

24      Q    Okay.

25      A    I believe -- I'm trying to recall who was in

```
1    front and who was in back, but I -- I don't really know

2    who went out the door first.  I know I was in between the

3    police officers and Duncklee.  I don't know who went out

4    the door first.  I'm going to guess that the police

5    officers went out first.

6         Q    Were you handcuffed at that point?

7         A    No.

8         Q    Did Heidi come out with you?

9         A    No.

10        Q    Did she close the door behind the four of you?

11        A    Yes.

12        Q    And were you taken then to Duncklee's car?

13        A    Well, he -- once I got out on the front lawn he

14   handcuffed me then.

15        Q    Duncklee did?

16        A    Yeah.

17        Q    Did the officers assist him in that process or

18   did he do it?

19        A    No.

20        Q    And you didn't resist him or anything?

21        A    No.  No.

22        Q    Did he say anything to you while he was

23   handcuffing you?

24        A    He said something about, "I didn't do this inside

25   because there were kids in there."  I think that's what he
```

```
1    said.

2         Q     Okay.  Had you seen the kids at some point from

3    the time at which the officers arrived --

4         A     Yes.  There was one of them in the kitchen that

5    went -- he was sitting in one of the chairs in the kitchen

6    and just said, "What's going on?  What's going on?"

7         Q     Which one was that?

8         A     The thinner one.  His name is Bill.

9         Q     At what point did you see him and hear him say

10   that?

11        A     Coming back from my office with all the police

12   officers.

13        Q     Okay.  Was that the first time that you had seen

14   him?

15        A     Yes.

16        Q     What was the response to his question of "what's

17   going on"?

18        A     I didn't say anything to him.

19        Q     Did anyone?

20        A     I'm really not sure.

21        Q     Did Heidi say anything to him?

22        A     I think she might have, but I don't know what she

23   said.

24        Q     Okay.  From that point you were handcuffed and

25   you were taken by Duncklee to Corrigan correctional
```

1  facility?

2        A    Yes.  He -- well, he put me in the car.

3        Q    Understood.

4        A    Yeah.

5        Q    Okay.

6        A    He made some comments and asked a question of me.

7        Q    We'll get to that.

8        A    Okay.

9        Q    What were the police officers doing while you

10 were being handcuffed?

11       A    Walking to their cars.

12       Q    Did you have any further interaction with the

13 police officers?

14       A    No.

15       Q    Did they say anything to either you or Duncklee

16 after you were handcuffed?

17       A    No, not to my knowledge.  They were ahead of me

18 at that point.

19       Q    Okay.  Which vehicles left the scene first, in

20 what order?

21       A    I believe the police cars left first.  Duncklee

22 drove up to the end of my -- I have two driveways.  Drove

23 up to the end of my second driveway, turned around, drove

24 off.

25       Q    Have you now described for me everything that you

76

```
1        Q    Did that surprise you that a marshal would be
2   using improper English?
3        A    Well, I thought an official of the state would
4   know how to speak the English language properly.
5        Q    Did you correct him?
6        A    No.
7             MR. KARSTEN:  Let me just take a two-minute
8             break.
9             (A recess was taken at 12:34 p.m.)
10            (The proceedings resumed at 12:36 p.m.)
11  BY MR. KARSTEN:
12       Q    What was the last thing that Heidi said to you
13  that evening?
14       A    She was standing by the front door.  I kissed her
15  on the way out.  She was visibly -- now I saw her up
16  close, so she was, you know, crying and visibly shaken and
17  she was -- her face was trembling.  I think I said, "See
18  you tomorrow" or "I'll be all right" or something like
19  that, and I don't know if she -- I don't know if she
20  responded.  I don't remember.
21       Q    At any point during this interaction did she ask
22  you what the charge was or what the reason was that you
23  were being arrested?
24       A    No.
25       Q    Had she known about the child support arrearage
```

1    as of prior to that date?

2        A    I believe we talked about it, yeah.

3        Q    Do you have a recollection of having that

4    conversation with her?

5        A    I have a recollection of having a conversation.

6    I don't have a recollection of when or where or what was

7    said.  Because it was, you know, years before that,

8    probably, when I first met her.

9        Q    When did you meet her?

10        A    December of 1999.

11        Q    At some point you told her that you had an

12    outstanding child support obligation of some amount; is

13    that right?

14        A    I think that's a fair statement.

15        Q    Did you give her any idea of how much the claim

16    was?

17        A    No.

18        Q    Did you tell her that you had declined to appear

19    in court in connection with that claim?

20        A    I don't really recall.  I do recall a

21    conversation that I told her about with my children, that

22    because of my ex-wife's inheritance and the length of

23    time, that it was likely that they weren't going to even

24    bother to come after me for it because my ex-wife really

25    didn't need the money.

1    any cars; police cars or other vehicles?

2        A    No.

3        Q    The federal suit that you filed against the five

4    state judges, in which court did you file that?

5        A    Where was that court?  I don't remember, but I

6    think it was New Haven.

7        Q    Do you know what judge was assigned to that

8    matter?

9        A    No, I don't.

10       Q    Your recollection is that was dismissed because

11   the judges had absolute immunity?

12       A    Yes.

13       Q    And the Second Circuit upheld that finding?

14       A    Yes.

15       Q    Am I correct on my dates that your petition for

16   modification of your child support that was brought before

17   Judge Teller was denied in 1995?

18       A    Well, I had made several petitions to modify it

19   before several judges.

20       Q    The final time your efforts to modify your child

21   support.  Do you know when that was?

22       A    That would have been before Judge Teller in '95.

23       Q    From that time, 1995, until September 30th of

24   2002, were you contacted in any way by either your ex-wife

25   or her lawyer to try to obtain payments of child support?

1      A      I actually took a couple of days off just to

2   rest.

3      Q      At what point did you contact Attorney Traystman

4   regarding -- or Dixon, rather --

5      A      Oh.

6      Q      -- regarding this situation?

7      A      Probably on Friday, I'm thinking.  Again, I'm not

8   clear on when I talked to him about it.

9      Q      All right.  At any point between April of 1995

10  and August of 2002, did you become aware of any programs

11  in the State of Connecticut to vigorously enforce child

12  support arrearages by arrests of the so-called deadbeat

13  dads?

14     A      Did I become aware of any programs?

15     Q      Right.

16     A      I -- yeah, I had heard something on the news

17  about it.  Yeah.

18     Q      In response to learning of that information, did

19  you do anything to ascertain what your situation was in

20  terms of whether there were any proceedings then against

21  you?

22     A      No, I didn't.

23     Q      Okay.

24     A      Because my information at the time, whether it be

25  credible or not, was that she wasn't going to pursue it.

1

2                                    **CERTIFICATE**

3

4   STATE OF CONNECTICUT    )
                           )   SS:   West Hartland, Connecticut
5   COUNTY OF HARTFORD      )

6   I, Patricia Tyszka, a Notary Public duly commissioned and
    qualified in and for the County of Hartford, State of
7   Connecticut, do hereby certify that pursuant to notice
    there came before me on the 4th day of August 2005, at
8   10:34 a.m., the following named person, to wit:  STEVEN
    MILNER, who was by me duly sworn to testify to the truth
9   and nothing but the truth of his knowledge touching and
    concerning the matters in controversy in this cause; and
10  that he was thereupon carefully examined upon his oath and
    his testimony reduced to writing under my direction; that
11  the deposition is a true record of the testimony given by
    the witness; that the deposition may be signed before a
12  Notary Public.

13  I further certify that I am neither attorney nor counsel
    for, nor related to, nor employed by any of the parties to
14  the action in which this deposition is taken, and further
    that I am not a relative or employee of any attorney or
15  counsel employed by the parties hereto or financially
    interested in the action.

16
    In witness whereof, I have hereunto set my hand and affixed
17  my notarial seal this _____ day of _____, 2005.

18

19

20  Patricia Tyszka, LSR, RMR
    Notary Public
21  License No. 00046

22  My Commission Expires
    May 31, 2010

23

24

25

                      TYSZKA COURT REPORTING SERVICES
                              (860)379-7955