EXHIBIT C

1                UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF CONNECTICUT

3

4

5

6    STEVEN MILNER, ET AL.,    :   NO.  3:02CV-1929 (SRU)
                                :
7    VS.                        :
                                :
8    DUNCKLEE, ET AL.           :   August 30, 2005

9

10

11

12

13

14        DEPOSITION OF HEIDI E. CANNON

15

16

17

18

19

20

21

22              MICHELE C. CLIFFORD
            Licensed Shorthand Reporter
23              49 Long View Drive
          Simsbury, Connecticut  06070
24              (860)658-0500
              FAX (860)658-1199

25

1     A     Mystic, Stonington.

2     Q     Did your kids have to change school

3     between August 1 of 2001 and November 22, 2001?

4     A     They -- no.  They came from the summer of

5     2001 straight into the Stonington school

6     system.

7     Q     After you moved into the residence at 40

8     Trolley Crossing, was that the address that you

9     used as your permanent address?

10    A     Yes.

11    Q     Was that the address in which they were

12    registered for schools?

13    A     Yes.

14    Q     Were you listed in the phone book?

15    A     I was.

16    Q     At that address?

17    A     Maybe the following year, yes.

18    Q     Eventually?

19    A     Yes, I have a listed phone number.

20    Q     So is it fair to say that in all

21    significant respects you treated that residence

22    as your own?

23    A     Yes.

24    Q     Before September 30th of 2002, did you

25    have any knowledge that Mr. Milner had been

 1          involved in postdivorce proceedings with his

 2          first wife relating to child support issues?

 3          A    Yes.

 4          Q    What was it that you were told about

 5          that?

 6          A    I vaguely remember it.  He said something

 7          about a capias and I didn't know what a capias

 8          was.

 9          Q    This was before September 30, 2002?

10          A    Yes.

11          Q    Tell me what you recall about that

12          conversation.

13          A    He said that there was a capias and that

14          some day a marshal could come to the door and

15          they would get -- for child support.

16          Q    Did you have more than one conversation

17          on that subject, or was it just one?

18          A    No, more than one.

19          Q    When do you recall the first such

20          conversation occurring?

21          A    It was in January of 2000.

22          Q    How is it that you have a recollection of

23          that?

24          A    Because I met Steve in January of 2000.

25          Q    How did you meet him?

19

```
 1          A      A mutual acquaintance introduced us.

 2          Q      So beginning on January of 2000, you were

 3     aware that there was a possibility that a

 4     marshal could show up at the door seeking to

 5     serve a capias?

 6          A      Yes.

 7          Q      What else did Mr. Milner tell you about

 8     that?

 9          A      That he would have to pay the child

10     support at that time.

11          Q      Okay.  Did he tell you how much was

12     involved?

13          A      He may have.

14          Q      Did he tell you anything more about what

15     the capias was or what the nature of that legal

16     proceeding would be?

17          A      I don't recall.

18          Q      Did he tell you anything about

19     -- withdrawn.

20                 Did he express to you any opinions about

21     when and under what circumstances the capias

22     could be served?

23          A      That it could be served at any time, yes.

24          Q      He told you that?

25          A      I had the impression of that.  I don't
```

1    know if he told me that but I had that

2    impression, yes.

3    Q    Did you have any impression or did he

4    relate to you any information about where a

5    capias could be served or where it could not be

6    served?

7    A    uh-uh.

8    Q    You have to give an audible answer.

9    A    Where it could be served?

10   Q    Right.

11   A    No, he never told me I guess where it

12   could be served, at the house or outside the

13   house, I don't know.

14   Q    He never you told you about anything that

15   was any limitations on where a capias could be

16   served?

17   A    No.

18   Q    Could you estimate for me the number of

19   conversations you had with him about this

20   subject between January of 2000 and September

21   of 2002?

22   A    I think it was discussed a lot.  A lot

23   more than I can remember.  I can't count how

24   many times.

25   Q    Would you say maybe monthly, as

21

1    frequently as that?

2    A    Not in the beginning, no.  Not monthly.

3    Q    Did he ever express to you any intentions

4    to pay the child support arrearage before such

5    time as a capias might be served?

6    A    No.

7    Q    Did you ever talk to him about that?

8    A    Yes.

9    Q    Did you ask him why he didn't just pay

10    the child support?

11    A    Yes.

12    Q    What was the response?

13    A    He didn't think he owed it.

14    Q    Did he say why?

15    A    Because the ex-wife got the whole house

16    in the divorce.

17    Q    Okay.  Did you discuss with him the way

18    his first divorce had gone and any

19    dissatisfactions that he might have had with

20    that?

21    A    Yes.

22    Q    Was there anything that occurred prior to

23    September 30, 2002 that brought to your

24    attention the possibility that a marshal would

25    be serving a capias on Mr. Milner at any time

1          soon?

2          A       No.

3          Q       When did you and he get married?

4          A       June 21, 2003.

5          Q       So you were not married on September 30th

6          of 2002 obviously?

7          A       No.

8          Q       On September 30, 2002 sometime in the

9          evening, I take it that the marshal did show up

10         at the door; is that right?

11         A       Yes.

12         Q       Do you remember what time that happened?

13         A       It was around 9:30, it was after 9.

14         Q       How did it come to your attention that

15         there was somebody at the door?

16         A       There was a knock on the front door.

17         Q       What was your understanding at that time

18         as to whether Steven was at home or not?

19         A       Pardon?  What was my understanding?

20         Q       As to whether he was home or not?

21         A       We were having a glass of wine in front

22         of the fireplace in the kitchen.

23         Q       When the knock came on the door?

24         A       Yes.

25         Q       When you heard the knock, what was your

1    reaction?

2    A    Somebody's at the door.

3    Q    Okay.  Was anything said by Mr. Milner at

4    that time?

5    A    I don't know.  I think -- I don't know.

6    I don't want to guess.

7    Q    I don't want you to guess either.  I

8    honestly don't.  That doesn't help anybody.

9    But to the best that you can recall, did he say

10   anything when there was a knock on the door?

11   A    Maybe See who it is first.

12   Q    He asked you to see who it was first?

13   A    Yeah.  Maybe.  Something like that.

14   Q    Okay.  That's fine.  Okay.  Was there

15   anything further said at that point that you

16   recall?

17   A    No.  I just answered the door.

18   Q    Did he say he was going to go anywhere at

19   that point?

20   A    No.

21   Q    Was there more than one knock at the door

22   if you recall?

23   A    I don't remember that.

24   Q    Is there a knocker?

25   A    There's a knocker on the door, yes.

```
 1    Q      When you went to the -- this is the front

 2    I take it; is that right?

 3    A      Yes.

 4    Q      Are you able to look out and see who's

 5    there before you open the door?

 6    A      No.

 7    Q      There's no windows or peephole?

 8    A      Well, there's windows in the front of the

 9    house.  I could have looked out.

10    Q      Did you do that?

11    A      No.

12    Q      You opened the door?

13    A      Uh-huh.

14    Q      What did you see when you opened the

15    door?

16    A      Duncklee, Marshal Duncklee.

17    Q      Did you say anything to him or did he say

18    anything to you at that moment?

19    A      I don't know.  I think he said Marshal

20    Duncklee and I have an arrest warrant for

21    Steven Milner and then I said, "You can't come

22    in," and there was yelling.

23    Q      I'm sorry?

24    A      There was yelling.

25    Q      Let's get to that.  I just want to break
```

1    it down a little bit.  So you opened the door.

2    Did you open the door to the point at which you

3    could see him and he could see you?

4    A    I just barely had the door opened when he

5    started saying who he was and that he had an

6    arrest warrant for Steven Milner.

7    Q    Was he wearing a uniform

8    A    Was he wearing a uniform?

9    Q    Yes, ma'am.

10   A    I don't remember.  I don't think so, no.

11   Q    Did you observe anybody with him at that

12   moment?

13   A    Two police officers.

14   Q    Two police officers?

15   A    Yes.

16   Q    Now, we're to the point at which the

17   door, as you put it a minute ago, barely open?

18   A    Yes.

19   Q    Up to that point you indicated you had

20   not looked out the windows, were you able to

21   see the two police officers at that point?

22   A    Not really.

23   Q    Had you even seen the marshal as of that

24   moment?

25   A    Yes --

1    Q    So you --

2    A    -- kind of.  Well, the door was open

3    like this where I can see and there he is.

4    Q    Just for the record, you're gesturing a

5    foot or 18 inches.

6    A    For the record, yeah, a foot or 18 inches

7    I'd say.

8    Q    That's how far the door was opened?

9    A    Yeah, where I'm still facing frontwards

10   where I can see, but the door is not full open.

11   The door would be 9:00.  What do you call this?

12   Q    Okay.  Understood.  You had stuck your

13   head around the door to see who was there; is

14   that right?

15   A    I didn't have to.  The door was open

16   enough so I could see.

17   Q    Could you see three people there at that

18   moment?

19   A    I saw first Marshal Duncklee.

20   Q    Okay.  Did you see Stonington police

21   officers there at that moment also?

22   A    We're talking about seconds.  Not really.

23   Q    Okay.  My question is, are you able to

24   testify under oath that you saw one police

25   officer or two police officers?

1   A      I can testify that I saw two police

2   officers.

3   Q      At that moment?

4   A      After I looked past Marshal Duncklee, I

5   saw the police officers.  He was saying so much

6   at once I was focusing on that, and then I

7   stepped back and then I look and see what's

8   going on, and my reflexes, and then my eyes

9   looked beyond him and I saw two police

10  officers.  So it's that order.

11  Q      I Understand there's a sequence involved.

12  A      Yes.

13  Q      You said you stepped back, do you mean

14  you physically stepped back from the door?

15  A      No.  I meant mentally.  I stepped back to

16  look, you know, stepped back mentally.  I'm

17  being yelled at:  I have a arrest warrant for

18  Steven Milner, I'm Marshal Duncklee.  Or not in

19  that order.  And I was yelling, "You can't come

20  in."

21  Q      Okay.  What was the first thing that you

22  said to Marshal Duncklee, if you recall?

23  A      "You can't come in."

24  Q      At the time that you first said that to

25  him, did you know who he was, that he was a

1      marshal?

2      A      Yeah, I did.

3      Q      He had identified himself as a marshal?

4      A      Yes.

5      Q      That's pretty much the first thing he

6      said to you?

7      A      As I remember he did.

8      Q      He also explained to you that he had an

9      arrest warrant?  Is that what he said, that he

10     had an arrest warrant?

11     A      Yes.

12     Q      Can you estimate for me the number of

13     times that you said "You can't come in"?

14     A      Maybe three, five.

15     Q      Did you try to close the door?

16     A      Yes.

17     Q      Were you successful?

18     A      No.

19     Q      Why not?

20     A      His foot was on the threshold.  It was

21     in the way to close the door.

22     Q      You said it was on the threshold?

23     A      Is that the threshold?

24     Q      Right.  Did you say anything else to him

25     besides "You can't come in"?

1    A    I don't remember.

2    Q    Did he say anything in response to your

3    making that statement?

4    A    He kept saying he had an arrest warrant,

5    to let him in.  Yeah.  He said, "Let me in."

6    Q    Did he show you any paper at that point?

7    A    Yes.

8    Q    At what point did he show you the paper?

9    A    I think it was in front of him the whole

10    time.

11    Q    When you say in front of him, what do you

12    mean?

13    A    He was holding it in front of him the

14    whole time.

15    Q    Offering it to you to look at?

16    A    You know, I don't want to say.  I can't

17    remember.  I know he held it out to me

18    eventually, because he handed it to me and I

19    looked at it.

20    Q    While you were still both at the door?

21    A    Yes.

22    Q    So you did look at that paper?

23    A    Yes.

24    Q    Did you then hand it back to him?

25    A    Yes.

1    Q    What happened then?

2    A    I was still trying to not let him in.

3    Q    Were you trying to close the door still?

4    A    Yes.

5    Q    Were you still yelling at him, "You can't

6    home come in" after you had seen the paper?

7    A    I don't think so.  I don't remember.  He

8    was saying, "Let me see the garage."  He did

9    say that.

10   Q    Now, was that right while you were first

11   at the door, or was that after a few minutes or

12   a couple of minutes?

13   A    Well.

14   Q    Let me withdraw that question.

15        So far we have the door open about a foot

16   or 18 inches, you're trying to close it and

17   he's blocking you from closing it with his foot

18   over the threshold.  Okay?

19   A    Right.

20   Q    At some point, does Marshal Duncklee move

21   into the foyer area?

22   A    Yes.

23   Q    Did that happen after he had showed you

24   the paper?

25   A    Yes.

1    Q    When he moved into the foyer area, how

2    did it come about that the door was opened?

3    A    I let go of it and stepped back.

4    Q    Okay.  And then he came in and the

5    officers came in?

6    A    And then the officers came in, too.

7    Q    Had the officers said anything to you up

8    to that point?

9    A    No.

10    Q    When you stepped back into the foyer area

11    and the officers and Marshal Duncklee came in,

12    was the door closed behind them?

13    A    I don't remember.

14    Q    Okay.  Once they're in the foyer area, is

15    that when Marshal Duncklee asked to see the

16    garage?

17    A    No, it was when he was still standing

18    outside.

19    Q    Did he say why?

20    A    He was looking for Steve.

21    Q    You were aware of that?

22    A    Yes.

23    Q    You knew that Steve was there?

24    A    Yes.

25    Q    Did you call out to Steve?

1    A    No.

2    Q    Is it fair to say that you were trying to

3    protect him from the marshal?

4    A    Yes.

5    Q    When Marshal Duncklee asked you to show

6    him the garage, did you do that?

7    A    Yes.

8    Q    I mean, obviously, he had never been to

9    the house before, right?

10   A    Correct.

11   Q    So he didn't know where the garage was?

12   A    Right.

13   Q    Did you walk over with him to where the

14   garage was and say 'through that door' or

15   something?

16   A    I walked into the foyer into the hallway

17   and into the kitchen and then through mud room

18   and into my garage.

19   Q    Do you want to take a break?

20   A    I'm all right.

21   Q    Did the police officers, or either of

22   them come with you when you went over to the

23   garage?

24   A    Yes, all three of them came with me to

25   the garage.

1    A      John was confused but Billy, mostly, I

2    wanted him to know it was not his fault.

3    Q      Had you ever said anything to either of

4    them before this date about this possibility?

5    A      No.

6    Q      At any point before September 30th of

7    2002, had you become aware of any of the child

8    support enforcement measures that were being

9    undertaken by the state of Connecticut, the so

10   called dead beat dad?

11   A      Yes, I heard of it.

12   Q      You had?

13   A      Yes.

14   Q      Had you ever discussed with Steven that

15   enforcement process?

16   A      Yes.

17   Q      He was obviously a candidate for that

18   sort of thing, correct?

19   A      Yes.

20   Q      Did you ever ask him why don't you pay

21   the child support and avoid the problem?

22   A      Yes.

23   Q      What was the response?

24   A      He didn't think he owed it because his

25   ex-wife got the whole house in his divorce.

1    Q      So he knew that there was a court order

2    that he had to pay the child support?

3    A      Yes.

4    Q      But he just decided not to obey that; is

5    that correct?

6    A      Yes.

7    Q      He knew that he was supposed to appear in

8    court on the particular date in question but he

9    just decided not to do that.

10   A      The date in question?

11   Q      Right.  Back in '95 or '96?

12   A      Would that be the date.  Yes.  I don't

13   know if he knew that or not.

14   Q      Okay.  When did you first have any

15   discussions with him about filing this lawsuit?

16   A      I don't remember.

17   Q      Was it the day he got out of the jail or

18   was it a week later, a month later?

19   A      Maybe a month later.

20   Q      You recall, at some point, you had to

21   file a paper called "notice of intent to sue;"

22   do you recall doing that?

23   A      I signed a few papers so.

24   Q      Okay.

25   A      I recall signing papers.

1          off the record?

2                          MR. MILNER:  I just want a

3          bathroom break, that's all.

4

5                          (A brief recess was taken.)

6

7    BY MR. KARSTEN:

8          Q      Just a couple more questions.  During the

9          first part of your interaction with Marshal

10         Duncklee, you were saying, "You can't come in.

11         You can't come in"?

12         A      Right.

13         Q      You tried to close the door but his foot

14         blocked that, right?

15         A      Yes.

16         Q      At some point, did you stop trying to

17         close the door and take a step back?

18         A      Yes.

19         Q      Okay.  At some point you stopped saying,

20         "You can't come in.  You can't come in"?

21         A      Yes.

22         Q      Was that after he had showed you the

23         paper?

24         A      Well, I may have said it one more or two

25         more times after he showed me the paper.

1    Q    Okay.  But at some point, did you stop

2    saying that?

3    A    Yes.

4    Q    Is it fair to say that the officers,

5    including Marshal Duncklee and the two police

6    officers, could reasonably have perceived at

7    that point that you were no longer trying to

8    prevent them from coming into the house?

9    A    Yes.

10           MR. KARSTEN:  I have no more

11    questions.  Thanks very much.  Attorney Tobin

12    gets a chance to ask you some too.

13

14        CROSS EXAMINATION BY MS. TOBIN

15

16    Q    I introduced myself earlier.  My name is

17    Rhonda Tobin and I represent state Marshal

18    Duncklee in this lawsuit.

19    A    Okay.

20    Q    At any time on the evening of September

21    30, 2002, did Marshal Duncklee ever push you or

22    move you out of the way?

23    A    No.  He was trying to push the door open

24    against my foot.  My foot was holding the door

25    closed, too, while he was trying to push it.

1    Q      Once you, as you described for

2    Mr. Karsten once you stepped back --

3    A      Yes.

4    Q      -- and allowed Marshal Duncklee and two

5    police officers into the house, did he ever

6    touch you or push you in any way?

7    A      No.

8    Q      Once Marshal Duncklee had handed the

9    paper, the capias to Mr. Milner, do you recall

10   Mr. Milner asking if he could call his lawyer?

11   A      I don't recall it, but I think he did.

12   Q      Do you recall what Marshal Duncklee's

13   response to that one was?

14   A      I don't remember that part of the

15   conversation.  He probably allowed it because

16   we went in to call the attorney.

17              MS. TOBIN:  That's all I have.

18   Thank you for your time.

19              MR. MILNER:  I have a few

20   questions.

21

22        CROSS EXAMINATION BY MR. MILNER

23

24   Q      Mr. Karsten just handed me a copy of your

25   withdrawal from the lawsuit.

```
 1        Q      Do you remember me saying to

 2   Mr. Duncklee, "Calm down, I want to call my

 3   lawyer"?

 4        A      No.

 5        Q      Do you recall you saying to Mr. Duncklee

 6   "You don't have to cuff him, he's not going

 7   anywhere"?

 8        A      Yes.

 9        Q      Did you hear anyone say "Cuff him, Cuff

10   him, Cuff him"?

11        A      He may have said it.  You keep saying it

12   over and over and over again now I'm going to

13   start thinking and remember.  Yes, he may have

14   said it but I don't remember.  He may have said

15   it.

16

17              (A brief recess was taken.)

18

19   BY MR. MILNER:

20        Q      Ms. Tobin asked you if Marshal Duncklee

21   pushed you out of the way when the door was

22   open when you testified that you had your foot

23   against the door; is that correct?

24        A      Yes.

25        Q      When he pushed the door open, did he move
```

1   your foot?

2                    MS. TOBIN:   Objection to the

3   form.

4                    THE WITNESS:   No.  He was trying

5   to push, I stepped back, and that's when he

6   came in.

7                    MR. MILNER:   That's all I have.

8                    MR. KARSTEN:   I have no more

9   questions.

10

11          RE-CROSS EXAMINATION BY MS. TOBIN

12

13   Q      Do you know whether Attorney Dixon helped

14   either of you or Mr. Milner file this lawsuit?

15   A      No, he never helped us with any of this.

16   Q      He didn't have any involvement with any

17   of this lawsuit?

18   A      Not that I recall.

19                    MS. TOBIN:   Thank you.

20                    MR. KARSTEN:   All done.

21          (Deposition adjourned 3:21 p.m.)

22

23

24

25

1

2    STATE OF CONNECTICUT:

3                              ss

4    COUNTY OF NEW HAVEN:

5

6

7              I, Michele C. Clifford, a Notary

8    Public, do hereby certify:

9              That HEIDI E. CANNON, was by me duly

10   sworn in the within-entitled cause;

11             that said deposition was reported by

12   me, was thereafter transcribed under my direction,

13   and is a true and complete transcription of all

14   testimony given by said witness.

15             I further certify that I am not a

16   relative, counsel or attorney of any party, or

17   interested, financially or otherwise, in this

18   action.

19             IN WITNESS WHEREOF, I have hereunto set

20   my hand and seal at Guilford, Connecticut, this 9th

21   day of September, 2005.

22

23             _Michele C. Clifford_____
               Notary Public
24             My Commission Expires:
               January 31, 2010
25             License No.  00056