# EXHIBIT E

1

```
 1                UNITED STATES DISTRICT COURT
 2                   DISTRICT OF CONNECTICUT
 3    _____
 4                                    )
      STEVEN MILNER and HEIDI CANNON, )
 5                                    )
                       Plaintiff,     )
 6                                    )
                   vs.                ) 3:02CV1929 (JCH)
 7                                    )
      LESTER DUNCKLEE, individually and )
 8    official capacity,              )
      BRYAN SCHNEIDER, individually and )
 9    official capacity,              )
      MICHAEL PECKHAM, individually and )
10    official capacity,              )
                                      )
11                     Defendants.    )
                                      )
12    _____)
13
14
15
16        Deposition of BRYAN T. SCHNEIDER, taken pursuant
17   to the Federal Rules of Civil Procedures, at the law
18   offices of Robinson & Cole, Eugene O'Neill Boulevard,
19   New London, Connecticut, before Sarah J. Miner,
20   L.S.R., a Notary Public in and for the State of
21   Connecticut, on August 29, 2005, at 10:50 a.m.
22
23
24
25
```

SARAH J. MINER COURT REPORTING
8 Colonial Drive, Waterford, Ct 06385
860 447-9503

1    Q.  Did you know at the time on September 30th,
2    2000 whether or not Mr. Duncklee had a capias, arrest
3    warrant, or an invitation to dinner?
4    A.  I was advised by my supervisor that he had a
5    warrant.
6    Q.  So your supervisor told you he had a warrant?
7    A.  Correct.
8    Q.  When did you learn that the paper that Mr.
9    Duncklee was serving on September 30th, 2002, when did
10   you learn it was a capias and not an arrest warrant?
11   A.  I can't recall.
12   Q.  Do you recall any events of that evening?
13   A.  I do.
14   Q.  Do you recall me questioning whether or not
15   it was a capias or an arrest warrant?
16   A.  I recall there being a discussion between you
17   and the marshal.
18   Q.  Right.
19   A.  And you reviewing the paperwork.
20   Q.  Let's go to the events of that evening.
21       When you arrived at the house who knocked on
22   the door?
23   A.  The marshal.
24   Q.  Do you recall how many times he knocked on
25   the door?

1  Q. Then what did you do after that?
2  A. Well, I believe at some point Marshal
3  Duncklee was requesting to check to see if your
4  vehicle was there. And at which point --
5  Q. You were still standing in the foyer
6  at that point?
7  A. Yes. And then there was another discussion
8  of the car possibly being in the garage. And he asked
9  Mrs. Karsten if he could check the garage for the
10 vehicle.
11 Q. Did he do that?
12 A. He did.
13 Q. Did you follow him to the garage?
14 A. I didn't follow him completely to the garage,
15 I walked further into the house.
16 Q. Where did you stop, do you recall?
17 A. The specific room, no, I can't recall. I
18 remember being another 10 feet inside the house. I
19 don't remember what room that was.
20 Q. Well, were there couches in the room, beds in
21 the room?
22 A. Well, there was a couch.
23 Q. Was it a dining room, a kitchen, a family
24 room?
25 A. I guess it appeared to resemble a family

```
 1    in the foyer?
 2              MR. KARSTEN:  At what point?
 3    BY MR. MILNER:
 4        Q.  When he handed me the capias?
 5        A.  I believe so, to the best of my recollection.
 6        Q.  Do you recall him handing me the capias
 7    paper?
 8        A.  Yes, I remember you asking for it.
 9        Q.  And he handed me the paper, you observed
10    that?
11        A.  Yes.
12        Q.  And you are stating today that he was
13    standing in the foyer when he handed me the paper?
14        A.  To the best of my recollection, yes.
15        Q.  You don't recall Mr. Dunklee being upstairs
16    in my house?
17        A.  I don't recall seeing him upstairs in your
18    house, that is what you asked, did I see him?
19        Q.  Did you recall him walking up the stairs?
20        A.  I recall him walking up the stairs, yes.
21        Q.  You didn't actually see him upstairs?
22        A.  No, I don't think he made it to the top of
23    the stairs, to be honest with you.
24        Q.  Is that your recollection?
25        A.  That is my recollection, yes.
```

```
 1         Q.  Do you have any idea about whether or not a
 2    marshal serving a capias can walk through someone's
 3    home?
 4         A.  I have no knowledge of that.
 5         Q.  I think I asked you about the police academy
 6    teachings concerning a capias.
 7         A.  I don't believe you did regarding a capias.
 8         Q.  Well, let me ask you now, did you have any
 9    training concerning a capias or service of a capias in
10    the police academy?
11         A.  Not to my knowledge, no.
12         Q.  Did you have any training as to aiding a
13    marshal in serving a capias?
14         A.  Not to my recollection.
15         Q.  I would like you to observe this document.
16         MR. KARSTEN:  For the record it is Exhibit 1.
17    BY MR. MILNER:
18         Q.  The Plaintiff's Exhibit 1.
19         A.  The entire document?
20         Q.  What is the title of the document.
21         A.  United States District Court, District of
22    Connecticut.  The amended complaint.
23         Q.  Have you ever seen a copy of this document?
24         A.  I am unsure.
25         MR. KARSTEN:  There is no question pending.
```

1   A.   I did.

2   Q.   Is it your testimony here today that you do
3   not agree with the events as written?

4   A.   That is my statement, yes.

5   Q.   Do you recall when Mr. Dunklee came to the
6   door, and the door opened that he tried to push the
7   door open, and Ms. Cannon resisted the door?

8   A.   I never saw anyone pushing the door or
9   anybody resisting.

10   Q.   You didn't see that. But you have stated you
11   were 10 feet from the door?

12        MR. KARSTEN:   Objection to the form. That
13   is not what he said.
14   BY MR. MILNER:

15   Q.   No, I am asking him a different question.

16        MR. KARSTEN:   Ask him a different question,
17   don't mischaracterize his testimony.
18   BY MR. MILNER:

19   Q.   Did you state earlier you were 10 feet from
20   the door?

21   A.   I was in the area of the door in the walkway.

22   Q.   I think your testimony was five to 10 feet?

23        MR. KARSTEN:   Correct.

24        THE WITNESS:   That is what it was.

25   BY MR. MILNER:

C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public the 17th day of September, 2005.

_____
Notary Public

CSR NO. 00223
My Commission Expires:
November 31, 2007