UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEVEN MILNER and HEIDI CANNON, | : | |
| | : | |
| Plaintiffs, | : | |
| V. | : | CIVIL NO. 3:02CV01929(SRU) |
| | : | |
| LESTER DUNCKLEE, ET AL. | : | |
| | : | |
| Defendants. | : | MARCH 8, 2006 |

**DEFENDANT LESTER DUNCKLEE'S JOINT MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
FURTHER SUPPORT OF DUNCKLEE'S MOTION FOR SUMMARY JUDGMENT**

Defendant Lester Duncklee ("Duncklee") hereby opposes the plaintiff, Steven Milner's

("Plaintiff" or "Milner") motion for summary judgment ("Motion"), which pivots on the faulty

premise that his constitutional rights were violated when Duncklee served a capias issued by the

Connecticut Superior Court.  Although Plaintiff has attempted to impose artificial boundaries

between a capias and an arrest warrant, such boundaries do not find support in the common law

or the Connecticut General Statutes.  Because Duncklee's service of a valid capias did not violate

clearly established law or the protections afforded by the Fourth Amendment to the U.S.

Constitution, Duncklee is entitled to qualified immunity since his actions were objectively

reasonable under the circumstances.  Therefore, Plaintiff's Motion should be denied and

Duncklee's Motion for Summary Judgment should be granted as to all counts of Plaintiff's

Amended Complaint.

**ORAL ARGUMENT REQUESTED**

I.     **BACKGROUND**

    A.     **Reply To Facts Alleged In Plaintiff's Motion**

In his Motion, Plaintiff sets forth certain facts, which he claims are "undisputed." (Motion, at 7-8.)  While many of these facts are undisputed, Plaintiff arrives at several conclusions, which are neither undisputed nor supported by the evidence.  For instance, Plaintiff baldly asserts that "[t]he defendants *absolutely* knew that they were not in possession of an arrest warrant or search warrant for the plaintiff on September 30, 2002."  (Id., at 8.)  Clearly, this "fact" is hotly disputed as Duncklee and Peckham testified that based on their training, it is their belief that a capias and an arrest warrant are identical.  (Deposition of Lester Duncklee ("Duncklee Depo"), at 16-18; Deposition of Michael Peckham ("Peckham Depo"), at 16-18.)[1]

Despite this testimony, Plaintiff claims that "[t]he defendants *absolutely* knew that they were violating the plaintiff's Constitutional rights on September 30, 2002."  (Id., at 8.)  The evidence belies this assertion.  Not only did Duncklee testify that he believed that a capias was the functional equivalent of an arrest warrant, but this view was confirmed by the Director of Operations for the State Marshal Commission, who when shown the capias issued to Milner, identified it is as "capias warrant."  (Deposition of James Neil, at 23.)  Thus, the evidence establishes that Duncklee "absolutely knew" that he was obligated by law to serve the capias issued by the Connecticut Superior Court.

---

[1]     Copies of the deposition transcripts have been attached to the previous filings of the Plaintiff and Duncklee.

**B.     Reply To Plaintiff's Statement of Undisputed Facts In His Opposition[2]**

In an effort to avoid complying with Local Rules of Civil Procedure 56(a)2, the Plaintiff

has designated a large number of relevant facts recited in Duncklee's 56(a)1 Statement as

"immaterial" or "irrelevant" to the present action.  Even leaving aside that these evasive

responses are not permitted by the Federal Rules, Plaintiff's reasoning for this strategy is

inherently flawed.[3]

As an initial matter, Plaintiff claims that all facts and circumstances surrounding the

issuance of the capias are immaterial and irrelevant because he "has never disputed or challenged

the validity of the capias."  (Opposition, at 2.)  Plaintiff overlooks, however, that this Court, in

the September 15, 2003 hearing on the defendants' motions to dismiss, inquired into the

circumstances under which the capias was issued.  (Ruling, 9.15.03, at 3-4.)  In order to fill these

factual gaps, Duncklee requested that Attorney Gary Traystman, who was present at the hearing

which resulted in the issuance of the capias, provide an affidavit as to what transpired when the

capias was issued.  Rather than directly deny any of the allegations in this affidavit, Plaintiff

simply chose not to respond.  Therefore, Plaintiff's unsupported allegations regarding Attorney

Traystman should be rejected.

In addition, Plaintiff asserts that certain portions of Heidi Cannon's ("Cannon")

testimony, which directly contradict the allegations made in the Amended Complaint, are

"immaterial and irrelevant."  (Opposition, at 3.)  For instance, contrary to the allegations made in

---

[2]     Plaintiff has filed a pleading styled as an "Objection and Reply to Defendant Duncklee's Motion For Summary Judgment."  In order to avoid confusion, Duncklee will refer to this pleading as Plaintiff's Opposition.

[3]     Duncklee has separately filed a Motion To Have Facts Set Forth In 56(a)1 Statement Deemed Admitted.

the Amended Complaint, Cannon testified that she was aware that the plaintiff was home when Duncklee knocked on the door as they had been drinking wine in front of the fireplace. (Deposition of Heidi Cannon ("Cannon Depo."), at 22, 31-32.)  In order to avoid responding to this testimony, Plaintiff claims that these facts, which he clearly deemed to be relevant enough to include in his Amended Complaint, are now irrelevant.

Rather than address these issues, Plaintiff sets forth a number of unsupported assertions about Duncklee's entry into his residence.  As in his Motion, Plaintiff claims that:  "Duncklee knew and understood the distinction between a capias and arrest warrant on September 30, 2002."  (Opposition, at 4.)  As noted above, *supra*, this assertion is not supported by the testimony of Duncklee or the officers.  Nevertheless, Plaintiff claims, without support, that "[t]he *only* purpose that can be drawn from Duncklee intentionally intermingling the use of the words capias and arrest warrant is to frighten, confuse, threaten, and gain access to private citizen's homes which otherwise he would not be allowed to enter by law."  (Opposition, at 4)(emphasis added).  Plaintiff ignores, however, that Duncklee testified that he intermingled the terms because of his belief that the two forms of process were identical.

## II.     ARGUMENT

### A.     Duncklee Is Entitled To Qualified Immunity.

Consistent with his Amended Complaint, Plaintiff argues in his Motion that Duncklee violated his constitutional rights under the Fourth and Fourteenth Amendments by entering his home (along with officers Schneider and Peckham) without consent, and taking him into custody in accordance with a capias issued by the Connecticut Superior Court.  (Amended Compl., at 2.) At the core of Plaintiff's Motion is his contention that "no arrest warrant or search warrant was

obtained to enter [his] home or search his home on or before September 30, 2002." (Motion, at 10.) Even though Plaintiff concedes that a valid capias was issued by the Connecticut Superior Court, in Plaintiff's view, this capias was not equivalent to an arrest warrant. Therefore, Plaintiff maintains that the capias did not grant Duncklee the legal right to enter his residence to seize his person in violation of the Fourth Amendment.[4]  (Motion, at 8.)

Even leaving these alleged constitutional violations aside, because Milner seeks to impose individual liability on Duncklee, the doctrine of qualified immunity is implicated. It is axiomatic that the qualified immunity defense protects government officials from being personally liable for all civil claims, including Section 1983 claims, where the plaintiff seeks monetary relief. It provides both immunity from liability and immunity from suit, and is intended to shield defendants from discovery and lengthy trial proceedings. See Mitchell v.

---

[4]    To support his argument, Plaintiff cites to several United States Supreme Court opinions. (Motion, at 8-9; Opposition, at 12, 16.) The vast majority of these opinions hold that absent exigent circumstances, an officer may not make a *warrantless* home arrest. Duncklee does not dispute this premise. Rather, Duncklee maintains that the entry in this case was pursuant to a capias, which is the functional equivalent of a warrant.

Nevertheless, Plaintiff points to passages in two cases, which purportedly support his argument that a capias is not equivalent to an arrest warrant. (Motion, at 8-9)(citing Pembauer v. Cincinnati, 475 U.S. 411 (1976); State of Wisconsin v. Kryzaniak, 241 Wis. 2d 358 (2001)). Plaintiff first relies on dicta in a footnote in Justice Stevens' concurring opinion in Pembauer, in which Stevens noted that the "justification for forcible entry to serve a capias *may* be weaker than justification for forcible entry to serve an arrest warrant. . . ." Pembauer, 475 U.S. at 488 n.2 (emphasis added). The Court never decided this issue, however, as Justice Stevens recognized that in the confines of Pembauer, which concerned entry into a *third person's* premises, "it is unnecessary to rest on that possible difference." Id.  The Court has never revisited this issue.

Plaintiff's reliance on the Wisconsin Court of Appeals' opinion in Kryzaniak is also misplaced. As an initial matter, Plaintiff has misquoted the opinion. The Court did not expressly hold that "the capias does not rise to the level of an arrest warrant." (Opposition, at 9.) Yet, even if this point is implicit in the Court's opinion, this non-binding precedent should not be followed as the Court's statement regarding civil capiases contained no analysis or citation to case law. Indeed, both the common law and statutory law, see *infra*, undermine that Court's conclusion.

Forsyth, 472 U.S. 511, 525-27 (1985).  Qualified immunity is ultimately a question of law for the court, and is usually decided on summary judgment.  Id., at 526.

The Supreme Court established the basic test for qualified immunity in Harlow v. Fitzgerald, 457 U.S. 800 (1982).  The Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct *does not violate clearly established statutory or constitutional rights of which a reasonable person would have known*."  Id., at 818 (emphasis added).  A right is "clearly established" when "the contours of the right [are] . . . *sufficiently clear* that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987)(emphasis added).

Building upon the principles announced in Harlow, the Second Circuit has set forth a three-part analytical framework for assessing claims of qualified immunity.  "To be entitled to qualified immunity, the [defendant] . . . [has] the burden of proving, first, that [his] conduct fell within the scope of [his] official duties . . . ."  Huminski v. Corsones, 386 F.3d 116, 143 (2d Cir. 2004).  Second, the Court "must assess whether [the defendant's] actions violate clearly established rights of which an objectively reasonable official would have known."  Ehrlich v. Glastonbury, 348 F.3d 48, 60 (2d Cir. 2003)(internal quotation marks omitted).  Finally, even if the defendant's belief was mistaken, "[i]f the [defendant] reasonably believed that the entry did not violate the plaintiff's rights, [he is] entitled to qualified immunity . . . ."  Id., at 60 (internal quotation marks omitted).

### 1.    Duncklee's Conduct Fell Within The Scope Of His Duties.

As an initial matter, there is no dispute that Duncklee was performing a governmental function when he served a valid capias issued by the Connecticut Superior Court.  Although a state marshal is required by statute to serve the capias expeditiously, the manner in which this duty is carried out is left to the discretion of the state marshal.[5]  See General Statutes § 6-32 (stating only that "[e]ach state marshal shall receive process directed to such marshal when tendered, execute it promptly and make true return thereof. . . .").  Plaintiff does not dispute this. (Opposition, at 6)(conceding that "Duncklee was a governmental official performing a discretionary function").

### 2.    Duncklee Did Not Violate Plaintiff's Clearly Established Constitutional Rights.

At the core of Plaintiff's Amended Complaint is his contention that Marshal Duncklee and officers Peckham and Schneider violated his constitutional rights when they allegedly entered his residence without an "arrest warrant."  Specifically, Plaintiff argues that Duncklee's entry and subsequent search constituted a warrantless search in light of the fact that Duncklee only possessed a civil capias.  This argument should be rejected.

Plaintiff's constitutional claims arise out of a nucleus of facts, which are undisputed.  It is undisputed that Plaintiff intentionally failed to make a court appearance in 1995.  (Milner Depo., at 29-30; Traystman Aff., at ¶¶9-10.)  Thereafter, the Connecticut Superior Court judge who witnessed the failure to appear issued a capias for his arrest.  (Plaintiff's 56(a)2 Statement, at

---

[5]    A state marshal's discretion can be exercised in a variety of ways, including, but not limited to:  (1) when and where to serve the legal process; (2) whether to ask the assistance of the local police department; (3) whether to allow the arrestee to contact his attorney or obtain other personal possessions.

¶16.)  Marshal Duncklee served the capias at the Plaintiff's residence in 2002.  (Duncklee Depo., at 24.)

On September 30, 2002, at 9:30 p.m., Duncklee, accompanied by Peckham and Schneider, knocked on the door of Plaintiff's residence.  (Duncklee Depo., at 30-31, 34.)  Cannon opened the door of the residence.  Marshal Duncklee immediately identified himself and stated that he had an "arrest warrant" for Plaintiff.  (Cannon Depo., at 24, 28; Duncklee Depo., at 18, 35-36.)  After indicating that Milner was not home, Cannon attempted to close the door, but was unable to do so because a part of Duncklee's foot was over the threshold.  (Cannon Depo., at 28, 31-32.)  Duncklee had placed his foot over the threshold so that he could communicate with Cannon.  (Duncklee Depo., at 35.)  During this time, Marshal Duncklee handed the capias to Cannon and after she looked at it, she let go of the door, stepped back and Duncklee and the officers entered.  (Cannon Depo., at 29, 31, 49-50.)  After a search of the home was commenced, Milner came into the foyer and was placed under arrest.  (Milner Depo., at 58-59, 64.)

Based upon these facts, Plaintiff claims that he was the victim of an unreasonable search and seizure in violation of the Fourth Amendment.  Importantly, however, while it is well-established that the Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures"; U.S. Const. amend. IV; this right is not without limits.  Rather, the Supreme Court has recognized that an arrest warrant "authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home." Steagald v. United States, 451 U.S. 204, 214 n.7 (1981).  Put another way, "[a]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe that the

suspect is within." United States v. Lovelock, 170 F.3d 339, 343 (2d Cir. 1999)(quoting Payton v. New York, 445 U.S. 573, 603 (1980).[6]  Indeed, an arrest warrant would be ineffective if it did not carry such authority.   See United States v. Stinson, 857 F. Supp. 1026, 1029 (D. Conn. 2003).  Thus, contrary to Plaintiff's assertions in his Motion, under such circumstances, a separate search warrant is *not* necessary.  United States v. Lauter, 57 F.3d 212, 214 (2d. Cir. 1995); Lovelock, 170 F.3d at 344 (noting that while a search warrant is required when officers enter the home of a third party, the Supreme Court in Steagald "did not . . . prohibit entry into a residence reasonable believed to belong to the person *named* in the arrest warrant")(emphasis added).

    Nevertheless, Plaintiff claims that this limited right of entry afforded to "arrest warrants" is not applicable because a capias is not a warrant.  To support this argument, Plaintiff sets forth three primary arguments.  First, Plaintiff points to the text of the Fourth Amendment and the capias form that was issued for his arrest.  Specifically, Plaintiff argues that the Fourth Amendment does not mention capiases and the capias form does not mention "warrants." (Motion, at 12.)  Secondly, Plaintiff relies on the text of General Statutes § 54-2a to support his

---

[6]      In order to assess the reasonableness of an officer's belief that a suspect may be within a dwelling, the Second Circuit has held that "the proper inquiry is whether there is a reasonable belief that the suspect resides at the place to be entered to execute [the] warrant, and whether the officers have reason to believe that the suspect is present." Lovelock, 170 F.3d at 343 (internal quotation marks omitted).  Importantly, "[t]he officer's belief need not be correct, only reasonable." Tyson v. Willauer, 289 F. Supp. 2d 190, 197 (D. Conn. 2003).  In the case at hand, it was reasonable for Duncklee to conclude that Milner resided at Trolley Crossing Road given that this address was listed on a valid capias. Id.
    In addition, it was reasonable for Duncklee to expect that Milner would be home at 9:30 p.m.. See id. (holding that "once agents have a reason to believe that a suspect lives in a particular dwelling, they may reasonably infer that he will be home early in the morning"); see also Smith v. Tolley, 960 F. Supp. 977, 988 (E.D. Va. 1997)(holding that it was reasonable for officer to presume that plaintiff would be home at 10:30 p.m. on a Monday night).

claim that capiases are issued only in civil matters, and therefore, are not equivalent to "criminal" arrest warrants.  (<u>Id</u>., at 12; Opposition, at 10-11.)  Finally, Plaintiff claims that "[a] capias is not obtained by probable cause, or by oath, or affidavit."  (Motion at 12-13.)  Each of these arguments should be rejected because they attempt to draw artificial lines between "capiases" and "warrants" that have never existed in either the common law or the Connecticut General Statutes.

a.    **The Common Law Has Inter-Mingled The Terms "Warrants" and "Capiases."**

The term "capias" is defined by Black's Law Dictionary as "[a]ny of various types of writs that require an officer to take a named defendant into custody."  Black's Law Dictionary (7th ed. 2000).  Historically, the writ of capias was designed to ensure a defendant's attendance at court proceedings, either before or after they commenced.  Writs of capias were issued for a broad range of civil proceedings including for the collection of debts (*extendi facias*), unpaid fines (*pro fine*), and unsatisfied judgments (*ad satisfaciendum*).  The most common type of civil capias was a *capias ad respondendum*, in which a sheriff would take a civil defendant into custody prior to the commencement of the proceedings.  This type of process has now been replaced by personal service of summons.  <u>Burnham v. Superior Court of California</u>, 495 U.S. 604, 618 (1995).

While a writ of capias has often only been associated with "civil process," the writ was used in <u>criminal</u> proceedings as well.  Notably, at common law, a capias was issued after a party was indicted for treason or for a felony.  <u>Blackstone, Commentaries</u> (Chapter 24 – Indictments) ("[o]n indictments for treason or felony, a capias is the first process. . . ."); <u>see also</u> <u>United States v. Burr</u>, 25 F. Cas. 187, 188 (Cir. Ct. Va. 1807)(Chief Justice Marshall)(citing Blackstone's

10

Commentaries, refers to the English practice of issuing a "writ of capias" after an indictment for

a misdemeanor.)  Therefore, the English common law contemplated that a capias could be issued

as either criminal or civil process.

In recognition of the variety of proceedings that a capias could be employed, the terms,

"warrant" and "capias," have often been intermingled both by the courts and by various state

legislatures.[7]  One of the first examples of this intermingling occurred in United States v. Burr,

authored by Chief Justice John Marshall, who in analogizing to a previous Supreme Court case,

remarked, "a capias, or what is the same thing, a bench warrant was issued." Burr, 25 F. Cas. at

189.

Consistent with Chief Justice Marshall's description, in recent times, the intermingling of

the terms, "capias" and "warrant" has continued.  For example, in 2004, Judge Burns, in an

action against a federal marshal, noted, "[d]ue to the Plaintiff's total failure to respond to the

subpoena enforcement action, a capias, *or a civil arrest warrant*, was issued . . . ." Eck. v.

Gallucci, 321 F. Supp. 2d 368, 370 (D. Conn. 2004)(emphasis added).  Clearly, this statement

reinforces the proposition that a capias and a warrant can be one in the same.

This commingling of terms is not limited to cases in the District of Connecticut.  For

instance, the Fifth Circuit has noted:  "The capias . . . [is] Texas' equivalent to an arrest warrant

which is issued by the court or clerk and directed 'To any peace officer of the State of Texas. . .

.'" Smart v. Jones, 530 F.2d 64, 66 (5th Cir. 1976)(internal quotation marks omitted); see also

United States v. Hickman, 1996 U.S. App. LEXIS 8766, at *2 n.1 (4th Cir. 1996)(unpublished)

---

[7]     Plaintiff attempts to distinguish these cases by arguing that "[a] judge's statements are
not rulings on a specific issue."  (Opposition, at 12.)  Importantly, however, these statements
undermine Plaintiff's claims that it was not reasonable for Duncklee to believe that a capias and
warrant are one in the same.

("[i]n Virginia a capias is the functional equivalent of an arrest warrant.  See Va. Code Ann. §

19.2-80 (Michie 1995)"); <u>Heine v. Connelly</u>, 644 F. Supp. 1508, 1511 (D. Del. 1986)(noting that

capias issued for defendant who failed to appear on misdemeanor complaint "is essentially a

bench warrant for the arrest of [the] accused. . . .")  As a result, because courts and state

legislatures have declined to draw artificial lines between capiases and warrants, Plaintiff's

linguistic arguments are unavailing.

>   **b.**    **Treatment Of Capiases By The Connecticut General Statutes**

Consistent with this case law, the Connecticut General Statutes provides for the issuance

of capiases in both criminal and civil matters.  Nevertheless, Plaintiff has relied on General

Statutes § 54-2a to support his argument that a warrant is for criminal process and a capias is for

"civil process."  As a matter of statutory interpretation, Plaintiff maintains that subsections (a)(1)

and (a)(3) makes a clear distinction between criminal arrests and civil arrests.  (Motion, at 12;

Opposition, at 10-12.)

The Plaintiff has misread Section 54-2a.  Contrary to Plaintiff's assertion, Section 54-2a

applies <u>only</u> to criminal cases and therefore, cannot apply to the capias issued as part of the

underlying divorce proceedings.  The application of Section 54-2a to criminal cases is supported

by three different reasons.

First, the introductory clause of Section 54-2a (a) clearly states that Superior Court judges

have authority "in all criminal cases" to issue bench warrants, subpoenas, and capiases.  There is

no indication in the statute that this authority extends to civil cases.

Secondly, subsection (a)(4), which is the "catch-all" provision, states that in addition to

issuing bench warrants, subpoenas, and capiases, a trial court can also issue "all other criminal

process. . . ." General Statutes § 54-2a (a)(4). Therefore, in the context of this statute, it is reasonable to conclude that the previously listed powers are all "criminal process."

Finally, it is noteworthy that the statute is located in Title 54, aptly named, "Criminal Procedure." As a result, a fair and balanced reading of Section 54-2a reveals that a capias issued pursuant to this statute must be characterized as "criminal process." See also State v. Rivera, 268 Conn. 351, 376 n.22 (2004) ("*[i]n a criminal trial*, if a witness violates a court order regarding any court appearance, that witness may be taken into custody pursuant to a capias issued by the trial court. See General Statutes § 54-2a (a)(3). . . .")(emphasis added).[8]

Even though Section 54-2a is not directly applicable to this case, the statute still sheds light on the relationship between capiases and arrest warrants. Contrary to Plaintiff's view, the text of the statute does not reveal that a bench warrant is to be treated differently from a capias merely because they are located in separate subsections.[9] Rather, the distinction drawn by the statute is based upon the *type* of the information that is required for the issuance of each form of process. In order to attain a bench warrant, an officer must submit an application that "shows

---

[8]     Although an arrest could theoretically be described as criminal in nature, the Connecticut Supreme Court has consistently looked to the end of the action (*i.e.*, recovery for civil injury) when assessing whether criminal or civil process has been issued. See Hinman v. Taylor, 2 Conn. 357, 360-61 (1817); Kuser v. Orkis, 169 Conn. 66, 71-72 (1975). In the case at hand, it is undisputed that the purpose of the underlying divorce proceedings was to achieve a civil remedy, *i.e.*, recovery of unpaid child support. Therefore, the process issued by the Superior Court must be considered "civil" in nature.

It appears that the Superior Court issued the capias at issue pursuant to one of the other multiple sources of statutory authority under which a court may issue such a capias. See, e.g., General Statutes § 46b-231. Alternatively, the Court may have issued the capias by invoking its common law authority to enforce its own orders. See In re Prenick, 19 Conn. App. 340, 347 (1989).

[9]     Indeed, it is noteworthy that the statute that governs warrantless arrests does not mention capiases. See General Statutes § 54-1f. Rather, the capias procedure is described in § 54-2a, which deals with the issuance of warrants.

that there is probable cause to believe that an offense has been committed and that the person complained against committed it. . . ."  See General Statutes § 54-2a (a)(1).  This application process is not necessary when a defendant fails to appear as the court itself witnesses this event. Therefore, probable cause is implicit in the Court's issuance of a capias.

Moreover, the legislative history of § 54-2a further undermines Plaintiff's claims that a clear line of demarcation exists between a capias and arrest warrant.  Prior to 1984, the statute granted the trial court authority to issue "warrants of capias" for witnesses who failed to appear (the power to issue capiases for parties who did comply with a court order did not exist until 1984).  In addition, prior to 1977, the statute explicitly grouped arrest warrants and capias warrants together, as it permitted trial courts to issue "warrants of capias for witnesses [and] warrants of arrest upon complaints made of crimes. . . ."[10]  General Statutes § 54-2a (Rev. 1975).

---

[10]      Section § 54-2a was amended several times from 1975 to 1984.  Importantly, the use of the phrase, "warrants of capias" remained throughout all of the amendments.  The following are excerpts of the statute after each substantive amendment.

Section 54-2a (Rev. 1975): "In all criminal cases the court of common pleas, or any judge thereof, may issue subpoenas and *warrants of capias for witnesses, warrants of arrest* upon complaints made of crimes, and all other criminal process, and administer justice in all criminal matters whereof said court has jurisdiction. . . ."  (emphasis added).

Section 54-2a (Rev. 1979):  "In all criminal cases the superior court, or any judge thereof, may issue subpoenas and *warrants of capias for witnesses, bench warrants of arrest* upon complaints made of crimes, and all other criminal process, and administer justice in all criminal matters. . . ."  (emphasis added).

Section 54-2a (Rev. 1983):  "(a) In all criminal cases the superior court, or any judge thereof, may issue (1) bench warrants of arrest upon application by a prosecutorial official if the court or judge determines that the affidavit accompanying the application shows that there is probable cause to believe that an offense has been committed and that the person complained against committed it, (2) subpoenas and *warrants of capias* for witnesses and (3) all other criminal process; and may administer justice in all criminal matters."  (emphasis added).

Notably, the legislative history during this time period is silent as to any perceived differences between the two "warrants."[11]

In 1984, Section 54-2a was amended in two major ways. First, the legislature removed the phrase "warrants of" before the word "capias" in the statute. Secondly, the legislature expanded the trial court's capias power by allowing for the issuance of a capias for witnesses and "for defendants who violate an order of the court regarding any court appearance. . . ." General Statutes § 54-2a (a)(3). Importantly, the legislature did not articulate any rationale for its deletion of the words "warrants of" from the subsection relating to capiases. This legislative silence suggests that the deletion was a technical revision and therefore, the words "warrant of" are simply subsumed in the term "capias." Indeed, there is no evidence that suggests that the legislature was contemplating a major substantive change to its treatment of capiases after 1984.

Importantly, the legislative history does provide guidance as to the rationale for expanding the capias power to defendants who failed to appear for a court appearance. For example, during Senate proceedings, the legislator who introduced the bill, noted:

> This Bill would allow the court to issue a capias in certain situations rather than using [a] more formal criminal arrest warrant. The situations covered in the Bill are when the accused in a criminal case has failed to appear in court for trial, violated any court order regarding appearance or forfeited bond.

See 27 Senate Proc., Pt. 4, 1984 Sess., p. 1393-94, remarks by Senator Owens, relevant excerpts attached Exhibit 2 to Duncklee's Motion for Summary Judgment. Consistent with the text of the statute, this passage reveals that the legislature intended to alleviate the burden on the trial court

---

[11]    In his Opposition, Plaintiff argues that because the terms "warrants of capias" and "arrest warrants" are separately listed, this suggests that "the legislature did not intend for the capias and arrest warrants to be one in the same." (Opposition, at 13.) This argument misses the point. The two types of warrants would never be combined into one term because two distinct types of information are needed before each can be issued.

by avoiding the "formality" of having an officer appear before it even in situations where the court itself had direct knowledge of the defendant's failure to appear or violation of a court order.

The proceedings before the Judiciary Committee also emphasize that these amendments were designed to enhance judicial efficiency. Judge Aaron Ment, who was the Chief Court Administrator at the time, explained to the committee that:

> Presently, when a defendant does not appear the judge has no alternative but to issue a rearrest and in some cases it's a cumbersome and difficult process which does not always result in the defendant being brought to court. *This would simply give the judge a second arrow in which he can attempt to have the court's orders complied with.*

See Interim Hearings of the Judiciary Committee, Pt. 2, 1983-84 Interim Sess., p. 596, relevant excerpts attached as Exhibit 3 (emphasis added) to Duncklee's Motion for Summary Judgment. Thus, contrary to Plaintiff's claims, these statements reveal that the legislature intended to afford equal status to these "two arrows," rather than impose artificial boundaries between the two forms of process.

### c. The Issuance Of A Capias Satisfies The "Probable Cause" Requirement In The Fourth Amendment.

Plaintiff's final argument in support of his theory that a capias is different from a warrant is that "[a] capias is not obtained by probable cause, or by oath, or affidavit." (Motion, at 12; Opposition, at 13-16.) This claim, which attempts to place form over substance, should be rejected.

It is axiomatic that an arrest warrant or a capias must be supported by probable cause because an "arrest," is considered a seizure under the Fourth Amendment. See California v. Hodari D., 499 U.S. 621, 624-627 (1991). The policy rationale for requiring that a warrant may

16

only be issued after a determination of probable cause by a neutral and detached magistrate was

set forth by the Supreme Court in <u>Steagald v. United States</u>, 451 U.S. 204 (1981).  The Court

explained:

> The purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest or conduct a search.  As we have often explained, the placement of this checkpoint between the Government and the citizen implicitly acknowledges that an 'officer engaged in the often competitive enterprise of ferreting out crime' . . . may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty and the privacy of his home.

<u>Id.</u>, at 212 (citation omitted).  Clearly, by its very nature, a capias is not issued in classic "arrest

warrant" fashion.  Indeed, an officer does not submit an application to the Superior Court, which

asserts that a party committed a crime, and as a result, a warrant should be issued.

Rather, the issuance of a capias is preceded by an independent finding of probable cause

by the Superior Court.  There is no dispute that the Plaintiff failed to appear at the 1995 hearing.

Rather than relying on an *ex parte* presentation of evidence by police officers, the Superior Court

had the opportunity to witness this failure to appear firsthand.  Indeed, Plaintiff has never

claimed that the capias that was issued was not valid.  (Traystman Aff., at ¶13.)

In addition, for purposes of the Fourth Amendment, there is no question that a Superior

Court Judge is properly considered a neutral and detached magistrate.  Unlike an officer engaged

in the competitive enterprise of ferreting out crime, the Superior Court was not involved in such

a pursuit.  As a result, the Supreme Court's concern about overly zealous police officers is

simply not relevant to this case.  Indeed, if the Court held to the contrary, a new rule would be

created whereby a judge, before issuing a capias, would have to find another Superior Court

judge to rule on the validity of that order.  In practical terms, the Superior Court judge issuing the

capias would be put in the place of a police officer seeking a search warrant.  Not only would

two judges need to be involved each time a capias is issued, but also each Superior Court judge

would have to halt his or her proceedings every time a capias was necessary.  Such a result

would be illogical.  See United States v. Ventresca, 380 U.S. 102, 108 (1965)(recognizing that

the "Fourth Amendment commands, like all constitutional requirements, are practical and not

abstract").

      Nevertheless, Plaintiff persists with his argument that "probably cause *has* to be

confirmed through oath or affidavit to convince a judge to sign the warrant . . . ."  (Opposition, at

13.)  This argument simply attempts to place form over substance.  Under either scenario, the

court must exercise its discretion as to whether there are sufficient facts to support the arrest of

the named party.  For purposes of the Fourth Amendment, this factual foundation can be satisfied

by a third-party affidavit or by the judge witnessing the party's non-appearance in open court.

      Ultimately, if the Court were to hold that a capias is not functionally equivalent to a

warrant, the Connecticut Superior Court would be stripped of its authority to enforce its own

orders.  Defendants could simply avoid arrest by remaining in their homes for an indefinite

period.  While Plaintiff concedes this point, he argues that "[t]he Court has empowered itself by

issuing the capias in the first place."  (Opposition, at 15.)  Yet, if the defendant can simply hide

in his home, then the capias becomes a meaningless piece of paper.  Such a result, which would

be based on an arbitrary line of demarcation, would undermine efforts by the State to ensure that

parties are held responsible for failing to pay child support and other obligations.  Accordingly,

because Duncklee's conduct did not violate Plaintiff's clearly established rights, Duncklee is

entitled to qualified immunity at to all counts of Plaintiff's Amended Complaint.

**3.     It Was Reasonable For Duncklee To Conclude That He Could Enter Plaintiff's Residence Pursuant To A Capias Issued By The Superior Court.**

Even if this Court determines that as a matter of law, a capias is not equivalent to an "arrest warrant" and therefore, does not permit Duncklee's entry, Duncklee should still be afforded qualified immunity.  Because Duncklee "reasonably believed that the entry did not violate the plaintiff's rights, [he is] entitled to qualified immunity . . . ."  Ehrlich, 348 F.3d at 60 (internal quotation marks omitted).

Nevertheless, Plaintiff argues that "[t]he defendants have been officers of the law long enough to know that their conduct on September 30, 2002 was violating the law and the rights of the plaintiff."  (Motion, at 13.)  Importantly, however, plaintiff overlooks that as illustrated above, *supra*, capiases and arrest warrants have historically been intermingled.  In addition, despite Plaintiff's claim that the Fourth Amendment "clarifies" the differences between the two types of process, he recognizes that capiases are not mentioned in the Amendment itself.  Rather, as recently as 2004, the District of Connecticut has referred to a capias as a "civil arrest warrant."  Therefore, if this Court changes course, or clarifies for the first time in Connecticut that a capias is not a warrant, such a holding would not necessarily mean that the law was clearly established on September 30, 2002.

In response, Plaintiff claims that two Connecticut cases, which were decided before the early 1900s "clearly established" that a capias was not equivalent to a warrant.  See e.g., Fourette v. Griffen, 92 Conn. 388, 391 (1918); Fitch v. Loveland, 1 Kirby 380, 386-87 (Conn.

19

1788)(Ellsworth, J., dissenting).[12]  Notably, both of those cases involved circumstances in which an officer broke an outer door, which did not occur in this case.  (Duncklee Depo., at 40-43; Cannon Depo., at 31, 50-51, 68-69; Deposition of Bryan Schneider ("Schneider Depo."), at 42.)  Indeed, Plaintiff concedes in his Local Rule 56(a)2 Statement that "Duncklee did not use any force to open the door."  (Plaintiff's 56(a)2 Statement, at ¶49.)

Plaintiff also argues that "[b]y their admission in the attached deposition testimony, [the defendants] clearly knew that no warrants were obtained [and] that Duncklee could not have possessed a warrant."  (Motion, at 14.)  Despite Plaintiff's vague reference to "deposition transcripts," he has provided no citation to such evidence.

Rather, the evidence that has been developed during discovery clearly establishes that Duncklee and the officers were hampered by the fact that they did not receive any training that even suggested that a capias was different from an arrest warrant.  (Duncklee Depo., at 11-12; Peckham Depo., at 9, 12, 48; Schneider Depo., at 39.)  Contrary to Plaintiff's assertions, both Duncklee and Peckham testified that based on their training, they understood that a capias and an arrest warrant are identical.  (Duncklee Affidavit, ¶5; Duncklee Depo., at 16; Peckham Depo., at 16-18.)  Indeed, James Neil, who presently serves as Director of Operations for the State Marshal Commission, when shown the capias issued to Milner, identified it as "capias warrant." (Deposition of James Neil, at 23.)  Additionally, Duncklee was trained that it was permissible to enter the residence of a person identified in a capias that had been issued by the Connecticut

---

[12]     Plaintiff also relies on <u>Commonwealth v. DeRosia</u>, 402 Mass. 284 (1988).  Ironically, this case further undermines Plaintiff's argument that a capias is limited to "civil arrests."  In DeRosia, the defendant "was wanted on a capias in New Hampshire for a weapons offense."  <u>Id.</u>, at 285.  Further, this case is distinguishable as it concerned the entry of officers into the home of a third party.

Superior Court once the door was opened, he identified himself, and he had reason to believe that

the person he was seeking to arrest was inside. (Duncklee Affidavit, ¶4.) Accordingly, it was

not unreasonable for Duncklee to enter the residence and conduct a limited search for the

Plaintiff pursuant to the authority of the capias issued by the Connecticut Superior Court.

Therefore, Duncklee is entitled to qualified immunity as to all counts in Plaintiff's Revised

Complaint.

### C.     Summary Judgment Should Be Granted In Duncklee's Favor On Plaintiff's Equal Protection, Due Process & 42 U.S.C. § 1983 Claims.

Plaintiff's Amended Complaint also alleges violations of his rights to Equal Protection

(Claim 2), Due Process (Claim 2),[13] and for damages under 42 U.S.C. § 1983 (Claim 3). This

Court has already ruled that these claims are viable only to the extent that they relate to the entry

of Duncklee and the officers into Plaintiff's residence. (Ruling, at 30-32, 40-41) As discussed

above, *supra*, each of these claims fails because they all hinge on the faulty premise that

Duncklee violated Plaintiff's constitutional rights when he entered Plaintiff's residence pursuant

to a valid capias issued by the Connecticut Superior Court.

Even if this Court were to find that qualified immunity is not applicable, Plaintiff's Equal

Protection claim still fails. It is well established that "[t]he Equal Protection Clause of the

Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be

treated alike." Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). In order to

establish an Equal Protection claim, the Plaintiff must show that "(1) the person, compared with

---

[13]     Because Plaintiff has not separately briefed his due process claim, the basis for this claim is not entirely clear. Nevertheless, Plaintiff does argue that: "Duncklee violated the plaintiff's Fourteenth Amendment rights under the due process clause by not obtaining an arrest warrant or search warrant." (Opposition, at 11.) Thus, if this Court determines that Duncklee is entitled to qualified immunity, Plaintiff's Due Process claim should also be rejected.

others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Crowley v. Courville, 76 F.3d 47, 52-53 (2d Cir. 1996). Plaintiff cannot satisfy either one of these elements.

To support his claim that he was selectively treated, the plaintiff relies on three arguments. First, Plaintiff points to the fact that he was served "at 9:30 p.m. so that he would be unable to make bail, and leave him in jail until the next day." (Opposition, at 18.) Importantly, however, Plaintiff has never disputed Duncklee's contention that he served the Plaintiff at that time of night because that is when people are usually home. (Duncklee Depo., at 30-31.) Plaintiff has offered no evidence that suggests otherwise.

Plaintiff also seeks to prove that he was selectively treated by claiming that "Duncklee relied on statements of [Attorney] Traystman . . . that 'this was going to be a difficult one.'" (Opposition, at 18.) Plaintiff conveniently overlooks that Duncklee testified that this comment had no bearing on how he approached the service of the capias. Rather, Duncklee testified that he did not anticipate any more resistance that he usually encountered during the service of a capias. (Duncklee Depo., at 25.) Indeed, Duncklee had never met the Plaintiff before and had no knowledge of his prior history. (Id., at 26-27.) The evidence shows that Duncklee treated the Plaintiff's capias like all others, and therefore, requested police protection in accordance with his usual practice. (Id., at 25.)

Because Plaintiff cannot point to any direct evidence of selective treatment, he alleges that "[i]t would be unreasonable for this court to believe that Duncklee treats all subject of his capiases as he treated the plaintiff." (Opposition, at 19.) First, this argument is contradicted by

Plaintiff's *own* brief.  Previously, in an effort to defeat Duncklee's qualified immunity claim, the plaintiff argued that "Duncklee has done this illegal method of service for years. . . ."  (Id., at 4.) Thus, in light of this inconsistency, Plaintiff's claim should be rejected.  Second, prior to September 30, 2002, Duncklee had served capiases upon other individuals in a manner that was consistent with how he served Milner on the night in question.  (Duncklee Affidavit, ¶6.)

Even assuming arguendo that Plaintiff can show that he was selectively treated, his equal protection claim still is unavailing.  The Plaintiff has neither alleged nor provided any evidence that establishes that Duncklee treated him differently based on his race or religion.  Rather, the Plaintiff relies on bald assertions, which allege that Duncklee intended to punish him for the exercise of his constitutional rights.  (Motion, at 10; Opposition, at 19.)  There is no evidence that even suggests that Duncklee intended to punish the Plaintiff.  Indeed, Plaintiff can make no such showing, as Duncklee testified that based on his training he clearly understood that a capias was the functional equivalent of an arrest warrant, and that he was allowed to enter the residence under these circumstances..  Therefore, Duncklee reasonably believed that he was well within his rights to enter the plaintiff's residence without violating the Constitution.

"Because [the Plaintiff cannot establish] selective treatment based upon his race, religion, or any intentional effort by the [defendants] to punish him for exercising his constitutional rights, [the Plaintiff] *must demonstrate* that [the defendants] maliciously singled him out . . . with the intent to injure him."  Crowley, 76 F.3d at 53 (emphasis added).  Although the Plaintiff, without citation to any evidence, asserts that Duncklee acted maliciously and with intent to injure, (Motion, at 10), there is no evidence that establishes that Duncklee had any intent other than to

serve a validly issued capias. Accordingly, Duncklee's motion for summary judgment should be granted as to Plaintiff's Equal Protection claim.

**D.    Plaintiff's State Law Tort Claims (Count Four) Are Also Barred By The Doctrine Of Qualified Immunity.**

Consistent with his Amended Complaint, Plaintiff seeks summary judgment on his various state law claims including "false representation" and "trespass." (See Count IV.) As this Court noted in its September 13, 2003 ruling, these claims were permitted to proceed to the extent that they related to the allegedly unlawful entry. (Ruling, at 36.) As a result, it is clear that these claims arise from the same factual allegations relied upon in Plaintiff's constitutional claims. Therefore, if this court grants summary judgment as to Plaintiff's constitutional claims, Plaintiff's pendant state law claims should be dismissed as well.[14]

**1.    Plaintiff Cannot Satisfy the Elements A False Representation Claim**

Importantly, however, even if this Court were to find that qualified immunity is not applicable, Plaintiff's "false representation" claim should still be rejected. In his Amended Complaint, Plaintiff alleges that "Cannon was deceived by Defendant Duncklee's false representation that he had an 'arrest warrant' as stated in Claim I. . . ." (Amended Compl., at 8.) Plaintiff renews this claim in his Motion as he asserts that the defendants "used the words 'arrest warrant' to misrepresent the facts as to why there were at the plaintiff's home on September 30, 2002, and to illegally gain access to the home and the plaintiff inside his home." (Motion, at 16.)

---

[14]    Alternatively, the Court could also decide not to exercise jurisdiction over Plaintiff's state law claims. See Zeppieri v. New Haven Provision Co., 163 F. Supp. 2d 126, 139-40 (D. Conn. 2001)(declining to exercise supplemental jurisdiction over remaining state law claims after court dismissed claims over which it had original jurisdiction).

It appears that Plaintiff's claim for "false representation" is in actuality a claim for fraudulent misrepresentation.[15] "The essential elements of an action in common law fraud . . . are that (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Investors, L.P., 260 Conn. 766, 777 (2002)(internal quotation marks omitted). Plaintiff has not satisfied these elements.

First, it is undisputed that the allegedly "false" misrepresentation was made to Cannon (a non-party) rather than the Plaintiff. (Amended Compl., at 8.) As a result, Plaintiff is unable to establish that he was induced to act (i.e., by opening the door) by relying upon this allegedly false representation. See Suffield, 260 Conn. at 778 (holding that plaintiff had failed to satisfy elements of fraud "because the allegedly false representation was not made to the plaintiff. . . .").

Nevertheless, in his Opposition, Plaintiff asserts for the first time that he was injured by this alleged misrepresentation. (Opposition, at 20.) Specifically, Plaintiff claims that: "Duncklee induced the plaintiff to act on his false statements, by arresting the plaintiff [and, as a result] the plaintiff was injured by spending a night in jail, and by having his constitutional rights violated by Duncklee and the defendant officers." (Id.) Plaintiff's argument should be rejected, however, as it is an attempt to re-argue his false arrest and false imprisonment claim that has already been dismissed with prejudice by this Court. (Ruling, at 36.) Indeed, this Court emphasized that the false representation claim survived only to the extent it was related to the

---

[15]    Indeed, the treatise that Plaintiff relies upon notes that "false representation" is one of the six basic elements of an action for fraud or deceit. Wright, Fitzgerald & Ankerman, Connecticut Law of Torts (3d Ed.) § 135 p. 391.

allegedly *unlawful entry*.  (Id.)  There is no dispute that Cannon, and not the plaintiff, heard this alleged false representation and thereafter, stepped back from the door.  Any statements made to the plaintiff occurred after the entry, and thus, are not related to the unlawful entry.

Moreover, Plaintiff has not established that Duncklee knew on the date of the incident that an "arrest warrant" was not equivalent to a capias.  While Plaintiff alleges, without support, that Duncklee "intentionally" used the words "arrest warrant" in an attempt to misrepresent why he was at plaintiff's residence, Duncklee has testified that based on his prior training, he believed that a capias is a valid arrest warrant.  (Duncklee Depo., at 16.)  In addition, Peckham testified that a capias and an arrest warrant are identical.  (Peckham Depo., at 16-18.)  Indeed, James Neil, who presently serves as Director of Operations for the State Marshal Commission, when shown the capias issued to Milner, identified it as "capias warrant."  (Deposition of James Neil, at 23.) Accordingly, the plaintiff has failed to establish that Duncklee's statement "was made without reasonable grounds, or that it was made recklessly."  Wright, Fitzgerald & Ankerman, Connecticut Law of Torts (3d Ed.) § 137 p. 393.

**2.     Plaintiff Cannot Satisfy The Elements of A Trespass Claim.**

Similarly, Plaintiff's common law trespass claim is unavailing.  It is well established that "[i]n order to recover on a claim for trespass under the common law, a plaintiff must show ownership or possessory interest in property; the physical invasion, entry or intrusion by defendant which affects the plaintiff's possessory rights; intent to do that which causes the invasion *and a direct injury to the plaintiff's property*."  Day v. Gabriele, No. CV030196802S, 2005 Conn. Super. LEXIS 2100, at *14 (Conn. Super. Ct. Aug. 10, 2005)(emphasis added). Plaintiff has not alleged, must less presented evidence, of a "direct injury to [his] property."  Id.;

see also Lake Garda Improvement Ass'n v. Battistoni, 160 Conn. 503, 516 (1971)(holding that

"[a] trespass on real estate is the doing of a direct injury *to property* by force")(emphasis added).

Rather, all of the injuries described in his Amended Complaint are properly characterized as

personal injuries.  See Conway v. American Excavating, Inc., 41 Conn. App. 437, 446

(1996)(finding that trial court properly disposed of trespass claim because "[n]o evidence of

depreciation in the value of [plaintiffs'] property or other evidence that might have provided a

basis for a monetary award was presented").  Plaintiff does not claim to the contrary.

(Opposition, at 21.)

 Instead, in an effort to save his claim from summary judgment, Plaintiff argues that he is

entitled to "nominal damages" for this alleged trespass.  (Id.)  Importantly, however, plaintiff has

not offered any evidence to support even a claim for nominal damages.  Therefore, Plaintiff has

failed to satisfy his burden with respect to each element of the trespass claim.  As a result,

summary judgment should be granted as to Plaintiff's trespass claim.

 Even assuming that this Court finds that the plaintiff's trespass claim should survive

summary judgment because he may be awarded nominal damages, Duncklee respectfully

requests that this Court issue a ruling that confines his claim to such damages.  In other words,

after failing to meet his burden of proof regarding evidence of actual damages, Plaintiff should

not be permitted to argue that he is entitled to an award of nominal damages in order to avoid

summary judgment and then argue at a later time that there was in fact actual damage to his real

property.

III.    **CONCLUSION**

Based on the foregoing reasons, Defendant Lester Duncklee respectfully requests that this

Court grant his Motion for Summary Judgment and deny Plaintiff Steven Milner's Motion for

Summary Judgment.

                                    **DEFENDANT,**
                                    **LESTER DUNCKLEE**


                                    By _____ /s/ Jeffrey J. White _____
                                    Rhonda J. Tobin (ct 07755)
                                    rtobin@rc.com
                                    Jeffrey J. White (ct 25781)
                                    jwhite@rc.com
                                    Robinson & Cole LLP
                                    280 Trumbull Street
                                    Hartford, CT 06103-3597
                                    Tel. No.: (860) 275-8200
                                    Fax No.: (860) 275-8299

**<u>CERTIFICATION</u>**

This is to certify that a copy of the foregoing was mailed, postage prepaid, on this 8th day

of March, 2006, to:

Mr. Steven Milner, pro se
40 Trolley Crossing
PO Box 25
Stonington, CT 06378

Scott M. Karsten
Karsten & Dorman, LLC
29 South Main Street, 2nd Floor South
P.O. Box 270722
West Hartford, CT 06107

                                        _____/s/ Jeffrey J. White_____
                                        Jeffrey J. White